**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**

IN RE:

PAMELA M. TOLLIVER                                    CASE NO. 09-21742
DEBTOR


PAMELA M. TOLLIVER                                               PLAINTIFF

V.                                                    ADV. CASE NO. 09-2076

BANK OF AMERICA, ET AL.                                         DEFENDANTS


**MEMORANDUM OPINION**


When the Defendants Ocwen Federal Bank, FSB ("Ocwen") and Bank of America, NA ("BOA") filed a Proof of Claim for a secured mortgage loan in the principal amount of $836.24 and $4,716.94 in outstanding fees and costs, the Plaintiff Debtor responded by filing an adversary proceeding objecting to the claim and asserting multiple counterclaims for violations of state and federal law based on an allegation that the Defendants improperly assessed thousands of dollars to the Plaintiff's account for fees and costs contrary to the terms of their agreement, which allegedly resulted in an artificially inflated balance that forced her into default and caused her to pay more than she actually owed on the account. The parties moved for summary judgment on the Plaintiff's claims and during the interim, the United States Supreme Court decided *Stern v. Marshall*, 131 S.Ct. 2594 (2011), which called into question how this Court, being a court of limited jurisdiction, may proceed with the Plaintiff's state law counterclaims.

The Court, having reviewed the parties' briefs and hearing oral arguments, and having considered the parties' supplemental briefs on the effect of *Stern* on this proceeding, finds that

1

this Court may enter final judgment on the Plaintiff's Objection to Claim and fraud/intentional

misrepresentation claim (Count III), conversion claim (Count IV), breach of implied covenant of

good faith claim (Count V), negligent misrepresentation claim (Count VI), breach of contract

claim (VII) and the FDCPA claim (Count IX), but the limitations set forth in *Stern* require it to

issue proposed findings of fact and conclusions of law as to the Plaintiff's remaining state law

counterclaims, i.e., the Plaintiff's claims for violations of K.R.S. §360.010 (Count I) and

violations of the Kentucky Consumer Protection Act (Count II).

Acting pursuant to that authority, the Court shall recommend to the District Court

following trial that it accept its proposed findings of fact and conclusions of law as to the

Plaintiff's claim for violations of the Kentucky Consumer Protection Act (Count II) and grant

summary judgment to the Defendant as a matter of law.  The Court shall deny both the Plaintiff

and the Defendants' cross-motions for summary judgment on the remaining claims, as there

remain genuine issues of material fact to be resolved at trial, and following trial, will recommend

the District Court accept its proposed findings of fact and conclusions of law as to the state law

counterclaims that are related to this proceeding but upon which this Court may not enter final

orders pursuant to 28 U.S.C. §157 and *Stern*.

**Factual and Procedural Background**

**A.     The Note and Mortgage**

The Plaintiff and her former husband, Richard Mulligan (now deceased),  executed a

note in the principal amount of $21,950.00 payable to Monmouth Federal Savings and Loan

Association of Newport ("Monmouth") on January 28, 1981 (the "Note").  The Note has a fixed

interest rate of 10.875% and is scheduled to be paid in three hundred monthly installments of

$213.17.  The Note was endorsed and assigned that same day to Kentucky Housing

Corporation (the "First Assignment").

Also on January 28, 1981, the Plaintiff executed and delivered to Monmouth a mortgage on real property in Campbell County, Kentucky (the "Mortgage"), to secure repayment of the Note. Like the Note, the Mortgage was assigned to Kentucky Housing Corporation.

The Plaintiff's Mortgage provides that the Plaintiff's monthly Note payments shall be applied in the following order: (1) premium charges under the contract of insurance with the Secretary of Housing and Urban Development, or monthly charge (in lieu of mortgage insurance premium), as the case may be; (2) ground rents, taxes, special assessments, fire, and other hazard insurance premiums; (3) interest; and (4) principal. The Note allows charges for late payments, but does not allow for recovery by the lender or holder of any costs or fees associated with default and foreclosure. The Note and Mortgage are collectively referred to as the "Loan."

Kentucky Housing Corporation assigned (the "Second Assignment") the Plaintiff's Loan to the Department of Housing and Urban Development ("HUD"). The Second Assignment of the Mortgage, dated February 28, 1995, states "the sum of $16,867.86, together with interest thereon from May 1, 1994 at the rate of 10.875% per annum, computed as provided for in the credit instrument, is actually due and owing under said credit instrument."

Ocwen Federal Bank, FSB ("Ocwen Federal Bank") and Blackrock Capital Finance, LLC, purchased the Loan sometime in 1997. HUD assigned the Loan to Ocwen Federal Bank (the "Third Assignment"). The Third Assignment of the Mortgage, dated March 7, 1997, states that "any changes in the payment obligations under the Note by virtue of any forbearance or assistance agreement, payment plan or modification agreement agreed to by U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ("HUD"), whether or not in writing, is binding upon the Assignee/Payee, its successors and assigns."

The parties do not dispute that the Defendant Bank of America, NA, as successor by merger to LaSalle Bank NA, as Trustee for the Certificateholders of the Mortgage Passthrough

3

Certificates 1997-R3 ("BOA"), is the current holder of the Note and Mortgage.  Ocwen Loan

Servicing, LLC ("Ocwen"), as successor in interest to Ocwen Federal Bank, is the servicing

agent for BOA.

**B.      The Forbearance Agreements**

Over the life of the Loan, the Plaintiff entered into a series of forbearance agreements

that have become an issue in this litigation.  The Defendants contend that the Plaintiff entered

into her first forbearance agreement with HUD on March 26, 1996 (the "1996 Forbearance

Agreement").  The Plaintiff admits she entered into a forbearance agreement with HUD in 1993

or 1994, but disputes that she entered into the 1996 Forbearance Agreement.   A copy of the

1996 Forbearance Agreement has been produced as evidence, but it does not bear the

Plaintiff's signature.

Whether the Plaintiff entered into the 1996 Forbearance Agreement is factually material

because the parties dispute whether the Plaintiff was current on her Loan at the time Ocwen

began servicing her loan, a fact that shall determine the applicability of one of the Plaintiff's

claims at issue herein.  Ocwen's records show that when it began servicing the loan on

January 1, 1997, the Plaintiff was in default and Ocwen did not receive the first payment on the

Loan until June 9, 1997.  But testimony by Ocwen's representative, Gina Johnson, reflects that

the Plaintiff was paying or performing under a payment plan with HUD, or the 1996 Forbearance

Agreement.

While the 1996 Forbearance Agreement and the status of the Plaintiff's Loan in 1997 is

disputed, the parties do not dispute that the Plaintiff entered into a series of three additional

forbearance agreements with the Defendants after BOA purchased the loan and Ocwen began

servicing it.  The Plaintiff entered into her first forbearance agreement with Ocwen on or about

July 24, 2003 (the "2003 Forbearance Agreement") based on an alleged delinquency in her

4

account of $2,013.76. The 2003 Forbearance Agreement does not authorize any additional

charges beyond the terms of the original Note and Mortgage.

In October of 2004, the Defendants filed a foreclosure suit against the Plaintiff in

Campbell Circuit Court based on the Plaintiff's alleged failure to pay a delinquency on the

account. The Plaintiff testified in her deposition that, at that time, she was paying her regular

monthly mortgage payment, but she was not paying additional fees and costs assessed to her

account because she believed them to be incorrect. The Plaintiff entered into a second

forbearance agreement on November 9, 2004 (the "2004 Forbearance Agreement") with the

Defendants to stop the foreclosure. According to the Defendants, as consideration for the 2004

Forbearance Agreement, the Plaintiff accepted the following revised conditions to her Note and

Mortgage as set forth in an addendum to the Agreement, which she signed:

**3B Fees and Costs**

b. You specifically understand that Ocwen has the right to charge, and add to your loan
balance, the costs of the following items: appraisals and broker price opinions,
inspections, any advances which are made to pay taxes and/or insurance, foreclosure
attorneys' fees and expenses, and collection fees.

The 2004 Forbearance Agreement also contains an agreement to release Ocwen for "any and

all claims, to the extent that any claims may exist now, that are related or connected in any

manner, directly or indirectly, to the Note, Mortgage, or aforementioned parties."

According to the Defendants, the Plaintiff failed to cure the delinquency on her account

as required by the 2004 Forbearance Agreement; as a result, the Plaintiff entered into a third

forbearance agreement on December 5, 2005 (the "2005 Forbearance Agreement"). The 2005

Forbearance Agreement identifies a default in the amount of $4,971.75 and contains the

following provision:

**14.    Borrower Release of Ocwen**

As consideration, the Borrower hereby releases Ocwen from any and all claims known
or unknown that the Borrower has against Ocwen, which in any way arise from or relate

to the Note, the Mortgage, the Loan, or the Default.  Borrower also specifically waives any right under any statute providing that a release does not extend to claims that the releasor did not know, did not have reason to know, and did not suspect to exist in his favor at the time of executing the release, which, if known by him, would materially affect his settlement with the releasee.  In the event Borrower has filed any affirmative defenses and/or counterclaim to any pending foreclosure filed by Ocwen or the holder of the Loan, Borrower does hereby withdraw same with prejudice, and does hereby specifically authorize this Agreement to be filed with the court, and waives any objections to the dismissal of such defenses or claims with prejudice.

The 2005 Forbearance Agreement, unlike its predecessor 2004 Forbearance Agreement, did not contain a clause regarding the recovery of fees and costs.  The 2005 Forbearance Agreement does contain the following provision:

**15.  Entire Agreement**

There are no other agreements between Ocwen and Borrower other than the express agreements contained in the Agreement, the Note and the Mortgage.  The Agreement supersedes all negotiations and other agreements between Ocwen and Borrower other than those set forth in the Note and the Mortgage.

The "Agreement" is defined as the 2005 Forbearance Agreement.

The Defendants instituted foreclosure proceedings for a third time on June 19, 2009 in Campbell Circuit Court based on an alleged default of $836.24. The Plaintiff then filed for Chapter 13 bankruptcy.

## C.    The Chapter 13 Bankruptcy and Adversary Proceeding

The Plaintiff filed for Chapter 13 bankruptcy on July 15, 2009.  The Defendants subsequently filed a proof of claim for a secured debt demanding $836.24 in outstanding principal, as well as $19.11 in interest, and $4,697.83 in outstanding fees and costs.  The Plaintiff objected to the proof of claim and then filed the present adversary proceeding.

The Plaintiff brought the underlying adversary proceeding on December 7, 2009, objecting to the Defendants' secured claim and asserting counterclaims for offset or recoupment.  The Plaintiff's counterclaims include the following:

(1)  violations of K.R.S. §360.010 (Count I);

6

(2)  violations of Kentucky's Consumer Protection Act, or K.R.S. §367.110
(Count II);

(3)  fraud/intentional misrepresentation (Count III);

(4)  conversion (Count IV);

(5)  breach of implied covenant of good faith (Count V);

(6)  negligent misrepresentation (Count VI);

(7)  breach of contract (Count VII);

(8)  "equity abhors a forfeiture" (Count VIII); and

(9)  violations of the Fair Debt Collection Practices Act, or 15 U.S.C. §1692
*et seq.* ("FDCPA") (Count IX).

The Plaintiff alleges that the Defendants have improperly assessed thousands of dollars
to the Plaintiff's account for additional late fees, property valuation expenses, certified mail
costs, foreclosure expenses and costs (including attorney's fees), bankruptcy fees and
expenses, property inspection fees, title report fees, optional products, and returned check fees.
The Plaintiff also asserts that the Defendants charged her fees that were duplicative, excessive,
or for services not actually rendered.  The Plaintiff claims that because of these unauthorized
and duplicative charges, her account was artificially forced into default when the Defendants
diverted her payments towards these unauthorized and illegitimate fees instead of applying her
payments to reduce her principal, interest, and escrow, as the Defendants were required to do
under the terms of the Note and Mortgage.  The Plaintiff claims that she has paid additional
interest beyond that allowed under or required by the Note and Mortgage.  The Plaintiff
concludes that the Defendants have collected more from her than she was obligated to pay.

The Defendants defend their actions on the grounds that the Plaintiff entered into a 2004
Forbearance Agreement that specifically authorized the Defendants to charge and add to her
Loan balance the following costs:  (1) appraisals; (2) broker price opinions; (3) inspections; (4)
any advances for taxes and/or insurance; (5) foreclosure attorneys' fees and expenses; and (6)

collection fees.  According to the Defendants, there was a delinquency in the account prior to

the 2004 Foreclosure that the Plaintiff never attempted to cure, leaving the previous fees and

costs assessed prior to the foreclosure unpaid.  Despite the 2004 foreclosure and subsequent

forbearance agreement, the Defendants contend the Plaintiff still did not cure the delinquency,

resulting in the 2005 Forbearance Agreement, which included a waiver of all claims against the

Defendants arising out of the Note, Mortgage or the default.

On June 17, 2010, the Defendants moved for partial summary judgment on several of

the Plaintiff's counts.  In support of their Motion for Summary Judgment, the Defendants argue:

- the Plaintiff's usury claim pursuant to K.R.S. §360.010 (Count I) is
  preempted by federal law, or the Home Owners Loan Act ("HOLA"),
  and is barred by the statute of limitations, or KRS §413.140(h);

- the Plaintiff's Kentucky Consumer Protection Act claim (Count II)
  cannot succeed because it does not apply to real estate
  transactions by an individual homeowner;

- the Plaintiff cannot prove the elements of fraud (Count III) or
  negligent misrepresentation (Count VI) without proof of reliance on
  alleged misrepresentations;

- the Plaintiff fails to state a claim under the FDCPA (Count IX)
  because Ocwen is not subject to the FDCPA; and

- the Plaintiff fails to state a claim sufficient to recover punitive
  damages.

The Plaintiff also moved for summary judgment on all her claims based on spoliation of

certain documents sought in discovery.  This includes: (1) documentation and information

confirming the amounts due and owing at the time the Defendants' acquired the Loan, such as

the Loan Sale Agreement between HUD and Ocwen, payment history or any prior servicing

history from HUD, and the Pooling and Servicing Agreement's Schedule 1, Mortgage Loan

Schedule; (2) documentation that would explain the basis of the fees charged after the

Defendants acquired the Loan, including the invoices explaining the purpose and amount of the

fees, as well as underlying records showing that payment was actually made by Defendants for

fees assessed against Plaintiff; and (3) documentation and information regarding the servicing software used by Defendants to service Plaintiff's account, including any software used to send out billing notices or other collection notices to Plaintiff, credit Plaintiff's payments, and used to schedule, assess, and collect fees.   The Defendants' position is that they no longer have the documentation and thus cannot produce such in response to the Plaintiff's discovery requests. The Plaintiff contends that this amounts to spoliation and she is therefore entitled to summary judgment on all claims.

In addition, the Plaintiff alternatively moved for summary judgment on her Kentucky Consumer Protection Act claim (Count II), as well as her breach of implied covenant of good faith claim (Count V), her breach of contract claim (Count VII) and the Defendants' affirmative defense that the Plaintiff's claims are preempted by the Depository Institutions and Monetary Control Act of 1980 ("DIDA")[1] based on grounds separate from the Defendants' alleged spoliation.

Following the filing of these cross-motions, the Court entered an order granting the Defendants' request to amend their answer to include the following affirmative defenses argued in their Motion for Summary Judgment: (1) the Defendants are not subject to the FDCPA because they are not "debt collectors" and (2) the Plaintiff's claim pursuant to K.R.S. §360.010 is preempted by 12 U.S.C. §1461, *et. seq.*, or the Home Owner's Loan Act ("HOLA").   The Court also allowed the Plaintiff time to serve additional discovery relating to the new defenses.   The Plaintiff also asked and received additional time to file dispositive motions on these newly asserted defenses.

---

[1] While the Plaintiff moved for summary judgment on the Defendants' affirmative defense pursuant to DIDA, there was no response by the Defendant to the Plaintiff's arguments and neither party briefed the issue beyond the initial motion, thus it appears to the Court that the Defendants have abandoned DIDA as grounds for a preemption defense and instead chosen to proceed under HOLA.

On July 8, 2010, the Plaintiff filed a second motion seeking summary judgment on the new affirmative defenses raised by the Defendants regarding the FDCPA and K.R.S. §360.010. The Plaintiff argued that the Defendants are subject to and did violate the FDCPA and her claims pursuant to K.R.S. §360.010 are not preempted by HOLA.

Following extensive briefing by both sides, the Court issued an order limiting oral arguments on the cross-motions for summary judgment to the preliminary issue of whether the Plaintiff has waived any claim arising prior to December 5, 2005, based on the language of the 2005 Forbearance Agreement.  After a long period of attempted mediation, which failed to resolve the issues between the parties, the Court issued an order denying the parties' cross-motions for partial summary judgment on the basis that there remain genuine issues of material fact regarding the enforceability of the 2005 Forbearance Agreement.

The parties were subsequently ordered to file supplemental briefs based on the Supreme Court's recent decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011).  The parties have since filed supplemental briefs and the Court has heard oral arguments on the remaining issues, including the applicability of *Stern* on this proceeding.  The matter is now ripe for the Court's determination.

## Discussion

### A.    The Effect of *Stern v. Marshall*

Before the Court may rule on the parties' cross-motions for summary judgment, the Court must first satisfy the requirement that it has subject matter jurisdiction over this proceeding and determine to what it extent it may enter a final judgment.  While the cross-motions for summary judgment were pending, the United States Supreme Court issued its opinion in *Stern v. Marshall*, 131 S.Ct. 2594 (2011), holding that a bankruptcy court lacks constitutional authority to enter a final judgment on state law counterclaims that are not necessarily resolved by a ruling on a creditor's proof of claim.  *Id.* at 2618.  In light of the

Plaintiff's objection to Defendants' Proof of Claim and the Plaintiff's counterclaims, most of which are based on state law, the Court ordered the parties to file supplemental briefs on the effect of *Stern* on this adversary proceeding.

To understand *Stern*'s impact on this proceeding, the analysis must begin with the Court's subject matter jurisdiction.  The Court's subject matter jurisdiction is governed by the grant of subject matter jurisdiction to the District Court pursuant to 28 U.S.C. §1334.  Section 1334 provides that "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. §1334(b).  To determine whether the District Court has subject matter jurisdiction, the question is to whether the matter is at least "related to" the bankruptcy.  *See Michigan Empl't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1141 (6th Cir. 1991).  A matter is "related to" the bankruptcy if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy" except in situations where there is only "an extremely tenuous connection to the estate."  *Id.* at 1141-42 (adopting the test as cited in *Pacor, Inc. v. Higgins (In re Pacor, Inc.)*, 743 F.2d 984, 994 (3d Cir. 1984)).[2]

There is no question here that the District Court has subject matter jurisdiction.  A proceeding to resolve an objection to a proof of claim is a proceeding that arises in title 11.  *See* 11 U.S.C. §502.  Moreover, in a Chapter 13 proceeding such as this one, any potential recovery of damages from state or federal law claims such as the ones alleged by the Plaintiff could conceivably augment the Chapter 13 estate as property of the estate.  *See Turner v. Universal Debt Solutions, Inc. (In re Turner)*, 436 B.R. 153, 157 (M.D. Ala. 2010) (finding that the

---

[2] "While *Pacor* was [effectively] overruled on other grounds by *Things Remembered, Inc. v. Petrar*, 516 U.S. 124, 134-135 (1995) (Stevens, J. Concurring), the *Pacor* test for "related to" jurisdiction was discussed favorably by the U.S. Supreme Court in *Celotex Corp. v. Edwards*, 514 U.S. 300, 308, 115 S.Ct. 1493, 1499, 131 L.Ed.2d 403 (1995), and in footnote 6 of *Celotex*, the Supreme Court noted that – as of that time – eight other circuit courts had adopted the *Pacor* test with little or no variation."  *Marks v. New Century TRS Holdings, Inc. (In re New Century TRS Holdings, Inc.)*, Bankr. No. 07-10416, Adv. No. 09-50244, 2011 WL 6097982, *2 n.5 (Bankr. D. Del. Dec. 7, 2011).

bankruptcy court has "related to" jurisdiction over a Chapter 13 debtor's claim for violation of

FDCPA); *Price v. America's Servicing Co. (In re Price)*, 403 B.R. 775, 779 (Bankr. E.D. Ark.

2009) (same).

     This adversary proceeding comes before this Court by referral from the District Court

pursuant to 28 U.S.C. §157(a), which states that "each district court may provide that any or all

cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a

case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C.

§157(a). The Eastern District of Kentucky, pursuant to its statutory authority to do so, has

referred such proceedings to this Court via Local Rule 83.12. Until *Stern*, the only limitation on

this referral power was that "personal injury tort and wrongful death claims" were required to be

tried by the District Courts. 28 U.S.C. §157(b)(5).

     Having established that the Court has subject matter jurisdiction over this proceeding,

the Court must determine the extent of its authority to enter final judgment in light of the

Supreme Court's decision in *Stern*. First, the parties do not dispute that this Court may issue a

final judgment on the Plaintiff's objection to the Defendants' proof of claim. The Court agrees.

The Supreme Court has expressly authorized the bankruptcy court to enter final judgment in the

claims resolution process. *Stern*, 131 S. Ct. at 2620.

     Second, while the parties agree that the Supreme Court's holding in *Stern* impacts this

Court's authority over the Plaintiff's counterclaims, they disagree as to the extent of that impact.

Starting with the most expansive interpretation first, the Defendants argue "the bankruptcy court

does not have jurisdiction to reach a final decision on the [Plaintiff's counterclaims] under the

constitution." *See* Defendants' Supplemental Brief (Doc. 111). The Defendants read *Stern* too

broadly. *Stern*'s holding is a narrow one:

> The Supreme Court plainly intended to, and in fact did, narrowly limit the
> scope of its holding in *Stern*. To begin with, it agreed that the question
> before it was a "narrow" one. It also specifically emphasized that Congress

only exceeded the limits of Article III in "one isolated respect."  And it
further emphasized that its narrow holding would not "meaningfully change"
the division of labor under section 157.

In fact, the Supreme Court's holding does even not [sic] remove all state-
law counterclaims from the bankruptcy court's jurisdiction.  The Supreme
Court recognized in *Stern* that whether a bankruptcy court can enter a final
judgment on a state-law counterclaim has to be decided on a case-by-case
basis.  And if after such analysis it is concluded that the counterclaim
stems from the bankruptcy itself or that nothing remains for adjudication of
the counterclaim once the bankruptcy judge resolves the claim objection,
then the counterclaim can be tried and finally resolved by the bankruptcy
court.

*In re Safety Harbor Resort & Spa*, 456 B.R. 703, 715 (Bankr. M.D. Fla. 2011); *see also In re*

*Olde Prairie Block Owner, LLC*, 457 B.R. 692 (Bankr. N.D. Ill. 2011).  *Stern* does not deprive the

Court of its jurisdiction over all of the Plaintiff's counterclaims – it merely limits the Court's ability

to enter final judgment on those state law counterclaims that do not "stem[ ] from the bankruptcy

itself" or that will not be necessarily resolved in the claims objection process.  *In re Safety*

*Harbor Resort & Spa,* 456 B.R. at 716 (*citing Stern*, 131 S. Ct. at 2616).

In contrast, the Plaintiff's position is narrower.  She argues that based on the holding in

*Stern*, the Court may only enter final judgment on two of her counterclaims  – the breach of

contract claim (Count VII) and the fraud/intentional misrepresentation claim (Count III).  The

Plaintiff takes the position that *Stern* prevents this Court from entering a final judgment on her

remaining counterclaims and asks this Court to abstain from hearing those claims.[3]

The Plaintiff, when asked if she consents to the entry of final judgment on these state

law counterclaims, stated that it was "too risky" without more.  The Defendants, on the other

hand, made a clear statement of consent during the oral argument on the Motions for Summary

Judgment.  The Court finds no prohibition or limitation in *Stern* regarding the parties' ability to

---

[3] The Plaintiff informed the Court at oral argument that she does not want to dismiss these state law
causes of action, but asks the Court to "abstain" from hearing them because to rule on them would be
"too risky" in light of *Stern*.  The Plaintiff's request to hold these counterclaims in limbo based on her fear
of a hypothetical result on appeal fails to address the issue of this Court's authority to enter final judgment
on these claims, and procedurally, how they should be resolved.

consent to the entry of final orders by the bankruptcy court pursuant to 28 U.S.C. §157(c).

Other courts have agreed.  *See e.g.*, *In re Safety Harbor Resort & Spa*, 456 B.R. at 718

("Parties may, even after *Stern*, consent to bankruptcy courts entering final judgments in non-

core matters.  In fact, section 157(c)(2) expressly authorizes bankruptcy courts to enter final

judgment in non-core proceedings if the parties consent.").  However, notwithstanding the

Defendants' clear consent, the Court is reluctant to imply the Plaintiff's consent[4] and thus will

proceed with its analysis of assuming a lack of consent by the Plaintiff  and, if warranted, make

recommendations to the District Court pursuant to §157(c)(1) accordingly.  In so doing, the

Court expressly rejects the conclusion of the court in *Samson v. Blixseth (In re Blixseth)*, Bankr.

No. 09-60452-7, Adv. No. 10-00088, 2011 WL 3274042, at *12 (Bankr. D. Mont. Aug. 1, 2011)

that it has no statutory authority to render findings of fact and conclusion of law for core

proceedings that it may not constitutionally hear.  Rather, the Court adopts the reasoning of the

district court in *RES-GA Four LLC v. Avalon Builders of GA, LLC*, in which the district court

concluded that "the bankruptcy court has, at a minimum, subject matter jurisdiction to hear

these related proceedings."  *RES-GA Four LLC v. Avalon Builders of GA, LLC*, Case No. 5:10-

CV-463, 2012 WL 13544, *9 (M.D. Ga. Jan. 4, 2012) (collecting cases criticizing the holding in

*Blixseth*).

Turning to the Plaintiff's state and federal law counterclaims, it is important to note that

the adjudication of each of the Plaintiff's counterclaims necessarily begins with an adjudication

of the enforceability of the Loan documents, a determination of what charges were authorized

by the Loan documents and the extent of the Debtor's performance thereunder.  In its simplest

form, this proceeding is about an accounting of the Debtor's payments and the application of

those payments by the Defendant.  These types of commercial contractual analyses, everyday

---

[4] The Plaintiff is free to file a clear statement of consent to this Court's entry of final judgment on her non-core but related to state law counterclaims at any time prior to the trial of this matter.

occurrences for bankruptcy courts, are a far cry from the debtor's counterclaim of tortious

interference at issue in *Stern*. Thus, at first blush, the Court observes generally that the instant

case does not present the "one isolated respect" discussed in *Stern*. However, the cautionary

admonition from the Supreme Court that *Stern* is to be interpreted narrowly does not relieve the

Court of the obligation to determine whether each of Plaintiff's counterclaims may be

"necessarily resolved" in the claims objection process. The Court looks to the Supreme Court

for guidance in how to make this determination—should the Court (a) examine the factual

overlap of the claim resolution and the counterclaim? or (b) compare the legal elements which

must be determined to resolve the claim and the counterclaim? or (c) compare the remedies

sought by the counterclaim and the impact of same on the claims allowance process? or (d)

some combination of the above?

The Supreme Court's determination of whether the counterclaim at issue therein was

"necessarily resolved" by the claim resolution process is based on the following analysis:

> In ruling on Vickie's counterclaim, the Bankruptcy Court was required to
> and did make several factual and legal determinations that were not
> "disposed of in passing on objections" to Pierce's proof of claim for
> defamation, which the court had denied almost a year earlier. *Katchen,
> supra,* at 332, n. 9, 86 S. Ct. 467. There was some overlap between
> Vickie's counterclaim and Pierce's defamation claim that led the courts
> below to conclude that the counterclaim was compulsory, 600 F.3d, at
> 1057, or at least in an "attenuated" sense related to Pierce's claim, 264
> B.R., at 631. But there was never any reason to believe that the process of
> adjudicating Pierce's proof of claim would necessarily resolve Vickie's
> counterclaim. *See id.,* at 631, 632 (explaining that "the primary facts at
> issue on Pierce's claim were the relationship between Vickie and her
> attorneys and her knowledge or approval of their statements," and "the
> counterclaim raises issues of law entirely different from those raise[d] on
> the defamation claim"). The United States acknowledges the point. *See*
> Brief for United States as *Amicus Curiae*, p. (I) (question presented
> concerns authority of a bankruptcy court to enter final judgment on a
> compulsory counterclaim "when adjudication of the counterclaim requires
> resolution of issues that are not implicated by the claim against the
> estate"); id., at 26.
>
> The only overlap between the two claims in this case was the question
> whether Pierce had in fact tortiously taken control of his father's estate in

the manner alleged by Vickie in her counterclaim and described in the allegedly defamatory statements. From the outset, it was clear that, even assuming the Bankruptcy Court would (as it did) rule in Vickie's favor on that question, the court could not enter judgment for Vickie unless the court additionally ruled on the questions whether Texas recognized tortious interference with an expected gift as a valid cause of action, what the elements of that action were, and whether those elements were met in this case. 275 B.R., at 50–53. Assuming Texas accepted the elements adopted by other jurisdictions, that meant Vickie would need to prove, above and beyond Pierce's tortious interference, (1) the existence of an expectancy of a gift; (2) a reasonable certainty that the expectancy would have been realized but for the interference; and (3) damages. *Id.*, at 51; *see* 253 B.R., at 558–561. Also, because Vickie sought punitive damages in connection with her counterclaim, the Bankruptcy Court could not finally dispose of the case in Vickie's favor without determining whether to subject Pierce to the sort of "retribution," "punishment[,] and deterrence," *Exxon Shipping Co.*, 554 U.S., at 492, 504, 128 S. Ct. 2605 (internal quotation marks omitted), those damages are designed to impose. There thus was never reason to believe that the process of ruling on Pierce's proof of claim would necessarily result in the resolution of Vickie's counterclaim.

*Stern*, 131 S. Ct. at 2617-18. In making this analysis, it appears to this Court that the Supreme Court looked not only to the factual overlap of the claim resolution and the counterclaim, but also the legal elements which must be determined to resolve the claim and the counterclaim and the remedies sought by the counterclaim and the impact on the claims allowance process. But it is not apparent from this analysis that any one of these issues is dispositive or that one issue is more important than another in comparing the factual overlap, the legal elements and the remedies. Because of this, this Court is left to conclude that while it should consider all these issues in making its case-by-case analysis, none are dispositive or carry more weight than the other.

Against this background, the Court shall proceed by addressing whether each of the counterclaims alleged are necessarily resolved in the claims objection process. If not, then they shall be treated as proceedings which the Court may hear, but not finally adjudicate absent the parties' consent. *Stern*, 131 S. Ct. at 2620; 28 U.S.C. §157(c); *In re Olde Prairie Block Owner, LLC*, 457 B.R. at 700 (explaining that §157 allocates authority to enter final judgment and is not

jurisdictional). Finally, once the Court has established the parameters within which it may

proceed, the Court shall then determine whether the moving party is entitled to summary

judgment on any of the Plaintiff's claims.

### B.    The Counterclaims

**1.    Count I - Violation of K.R.S. §360.010.**  The Defendants have moved for

summary judgment on the Plaintiff's claim that they violated K.R.S. §360.010, arguing that

K.R.S. §360.010 is preempted by the Home Owner's Loan Act ("HOLA"), or 12 U.S.C. §1461 *et*

*seq.*  The Plaintiff alleges that the Defendants violated K.R.S. §360.010 by charging the Plaintiff

interest on an artificially high principal balance as a result of assessing improper fees and costs.

K.R.S. §360.010 states,

> (1)  The legal rate of interest is eight percent (8%) per annum, but any
> party or parties may agree, in writing, for the payment of interest in excess
> of that rate as follows: (a) at a per annum rate not to exceed four percent
> (4%) in excess of the discount rate on ninety (90) day commercial paper in
> effect at the Federal Reserve Bank in the Federal Reserve District where
> the transaction is consummated or nineteen percent (19%), whichever is
> less, on money due or to become due upon any contract or other obligation
> in writing where the original principal amount is fifteen thousand dollars
> ($15,000) or less, and (b) at any rate on money due or to become due
> upon any contract or other obligation in writing where the original principal
> amount is in excess of fifteen thousand dollars ($15,000); and any such
> party or parties, and any party or parties who may assume or guarantee
> any such contract or obligation, shall be bound for such rate of interest as
> is expressed in any such contract, obligation, assumption, or guaranty, and
> no law of this state prescribing or limiting interest rates shall apply to any
> such agreement or to any charges which pertain thereto or in connection
> therewith; provided, however, nothing herein contained shall be construed
> to amend, repeal, or abrogate any other law of this state pertaining to any
> particular types of transactions for which the maximum rate of interest is
> specifically prescribed or provided.
>
> (2)  Any state or national bank may charge ten dollars ($10) for any loan
> negotiated at the bank in this state, even if the legal interest does not
> amount to that sum.

If the Defendants imposed improper fees and charges that resulted in an artificially inflated

principal balance therefore allowing the Defendants to consequently collect more interest than

actually due, the Defendants may be entitled to civil penalties.  K.R.S. §360.020(1) sets forth the

civil penalty for charging an excessive interest rate and provides:

> The taking, receiving, reserving, or charging of a rate of interest greater
> than is allowed by K.R.S. §360.010, when knowingly done, shall be
> deemed a forfeiture of the entire interest which the note, bill, or other
> evidence of debt carries with it, or which has been agreed to be paid
> thereon.  In case the greater interest rate has been paid, the person by
> whom it has been paid, or his legal representatives, may recover, in an
> action in the nature of an action of debt, twice the amount of interest thus
> paid from the creditors taking or receiving the same: provided, that such
> action is commenced within two (2) years from the time the usurious
> transaction occurred.

Thus, if the Defendants' "knowingly" charged interest in violation of K.R.S. §360.010, then

K.R.S. §360.020 requires a forfeiture of the interest and the Plaintiff may recover twice the

amount of such interest paid to the Defendants.

This cause of action depends on whether the Defendants actually collected more

interest than due under the parties' Loan agreement.  In ruling on the objection to claim, the

Court must determine the amount of interest contractually allowed and the amount of interest

collected and applied by the Defendants in order to determine the extent of the allowed amount,

if any, of Defendants' claim.  In making this determination, the Court does not, however,  have

to reach the issue of whether the interest charged exceeds what is statutorily authorized by

K.R.S. §360.010, nor does the Court have to determine whether the Plaintiff is entitled to twice

the amount of interest, which K.R.S. §360.020 allows but does not require.  *See Stern*, 131

S.Ct. at 2617.  Thus, because the Plaintiff's claim pursuant to K.R.S. §360.010 is not

"necessarily resolved" in ruling on the objection to claim, the Court may not enter a final

judgment on this cause of action, but may only make recommendations to the District Court

pursuant to 28 U.S.C. §157(c).

Regarding that recommendation, the Defendants contend that the Plaintiff's reliance on

K.R.S. §360.010 is expressly preempted by HOLA pursuant to 12 C.F.R. §560.2.  HOLA

18

authorized the Office of Thrift Supervision ("OTS") to promulgate regulations providing "for the organization, incorporation, examination, operation, and regulation" of federal savings associations and federal savings banks.  12 U.S.C. §1464(a).  The OTS received broad rulemaking authority to preempt state laws that would otherwise govern the banking activities of federal savings associations and banks.  *Id.* at §1465.  The OTS promulgated a regulation, 12 C.F.R. §560.2, occupying the field in connection with the lending operations of federal savings associations and banks and this regulation expressly preempts state laws such as state usury laws.  *See Molosky v. Washington Mutual, Inc.*, 664 F.3d 109 (6th Cir. 2011) (holding that the Michigan Usury Act, M.C.L.A. §438.31, a statute setting forth the legal interest rate in Michigan, is preempted according to the explicit terms of HOLA).

But the Plaintiff contends that the Defendants are not federally chartered savings associations as defined under HOLA and HOLA does not apply.  The Defendants do not dispute that they are not federally chartered savings associations but argue that the Loan was originated by Monmouth, which was a federally chartered savings association within the definition of HOLA; and thus, as an assignee of the loan originator, the Defendants may avail themselves of HOLA.

It is undisputed that the original Note is payable to Monmouth Federal Savings and Loan Association.  The Certificate of Succession, produced by the Defendants as evidence of Monmouth's status, shows that Monmouth Federal Savings and Loan Association was chartered to transact the business of a federal savings association.  There is no doubt that Monmouth originated the Loan or that it was a federal savings association governed by HOLA.  Thus there is no dispute of any material fact.

However, as a matter of law, the Defendants are incorrect that as assignees they may avail themselves of the defense of preemption offered by HOLA.  The case law is scarce on an assignee's ability to cloak itself in the originating federal savings association's preemption

defense.  The only case interpreting this issue is cited by the Defendants in support of their

position.  In *Bliss v. Intervale Mortg. Corp.*, Case No. 051137C, 2006 WL 6211986 (Mass.

Super. June 23, 2006), a Massachusetts state court relied on an official letter issued by Chief

Counsel of the OTS declaring that "those who purchase or are assigned loans originated by a

federal savings association would be subject only to the same claims and defenses that would

apply to the federal savings associations that originated the loan."  *Id.* at *6 (citing Office of Thrift

Supervision, Chief Counsel Letter (July 22, 2003)).

    While the Court does not dispute the conclusion reached by the OTS or the state court in

*Bliss*, the Defendants' reliance on this conclusion is misplaced.  The OTS determined that an

assignee may step into the shoes of a federal savings association that originated the loan and

use the same claims and defenses.  But here, there are no allegations against Monmouth, the

federal savings association that originated the Loan, in the Plaintiff's Complaint.  The only

allegations by the Plaintiff are regarding the alleged bad acts of the Defendants.  Therefore, with

no claims against it, Monmouth has no need of any defenses and thus the Defendants have no

shoes to fill.

    Other courts have concluded that where a federal savings association as an assignee

seeks to invoke the preemption defense for allegations made regarding bad acts of the

originating lender, which is not a federal savings association, the assignee may not invoke such

a defense because to do so would allow an originating bank to cleanse its otherwise illegal

activity merely by assigning it to a federal savings association.  *See e.g., Thomas v.

CitiMortgage, Inc. (In re Thomas)*, 447 B.R. 402, 407 (Bankr. D. Mass. 2011).  The Court finds

the same reasoning applies here.  The Defendants should not be allowed to hide behind a

defense created solely for Monmouth, a non-party, in order to defeat allegations made against

the Defendants that are unrelated to any acts of that non-party.  For this reason, HOLA is not

applicable to the Defendants.

As an alternative, the Defendants take the position that the statute of limitations pursuant to K.R.S. §413.140(1)(h) precludes the Plaintiff's potential recovery under K.R.S. §360.020. This argument is unpersuasive.  K.R.S. §413.140(1)(h) is not applicable because K.R.S. §360.020, the statute that the Plaintiff cites in Count I for her recovery, contains its own statute of limitations that requires an action be commenced within two years from the time the usurious transaction took place.  *See* K.R.S. §360.020(1).  The Plaintiff made her final payment of $798.11 on December 3, 2008 and the Plaintiff's Complaint was filed on December 7, 2009; the Plaintiff was within her two year limitations time period.  Furthermore, to the extent that the Plaintiff has asserted a counterclaim pursuant to K.R.S. §360.010 and §360.020 in order to offset the claim made by the Defendants as a mere defense, the statute of limitations does not apply.  *See Empire Fin. Co. of Louisville, Inc. v. Ewing*, 558 S.W.2d 619 (Ky. App. 1977).

Based on the foregoing, the Defendants' Motion for Summary Judgment on Count I shall be denied.

2.    **Count II - Kentucky Consumer Protection Act.**    The Defendants have moved for summary judgment on the Plaintiff's claims that they violated the Kentucky Consumer Protection Act, or K.R.S. §367.110 *et. seq.*, arguing that the Kentucky Consumer Protection Act does not apply to real property transactions.  The Plaintiff has also moved for summary judgment on her Kentucky Consumer Protection Act claim.

The Plaintiff may prevail under the Kentucky Consumer Protection Act (Count II) by providing clear and convincing evidence of "unfair, false, misleading, or deceptive acts" in a consumer transaction.  *See* K.R.S. §367.170.  The Plaintiff alleges that the Defendants violated the Kentucky Consumer Protection Act by: (1) attempting to maximize profits by putting the Plaintiff's account in default; (2) engaging in a scheme and course of conduct to inflate corporate profits by collecting various fees not authorized by the Loan documents; and (3) misapplying the Plaintiff's payments contrary to the terms of the Note and Mortgage.  While

21

some of the facts relied upon by the Plaintiff to prove a violation under K.R.S. §367.170 are

facts that support her objection to the claim of the Defendants, i.e. the misapplication of

payments, the claims resolution process does not require the Court to take the additional step of

determining whether this behavior is "unfair, false, misleading, or deceptive" as defined in

Kentucky's Consumer Protection Act.

Furthermore, resolution of the Plaintiff's Kentucky Consumer Protection Act claim may

require a determination of whether an award of punitive damages as requested by Plaintiff is

appropriate.  *See* K.R.S.  §367.220.  Plaintiff's possible entitlement to punitive damages will

require a finding that the Plaintiff has shown by clear and convincing evidence that the

Defendant acted with fraud, oppression, malice and/or gross negligence,[5] which is not a finding

that the Court must reach in resolving the objection to the claim.   *See Stern*, 131 S. Ct. 2617

("Also, because Vickie sought punitive damages in connection with her counterclaim, the

Bankruptcy Court could not finally dispose of the case in Vickie's favor without determining

whether to subject Pierce to the sort of 'retribution,' 'punishment[,] and deterrance'…those

damages are designed to impose.  There thus was never reason to believe that the process of

ruling on Pierce's proof of claim would necessarily result in the resolution of Vickie's

counterclaim.") (citations omitted).  Therefore, the Plaintiff's claims for violation of the Kentucky

Consumer Protection Act will not be "necessarily resolved" in the claims resolution process and

the Court shall make recommendations to the District Court as to the disposition of this claim.

With that in mind, this Court has previously ruled, based on *Craig v. Keene*, 32 S.W.3d

90 (Ky. App. 2000), *GMAC Mortg., LLC v. McKeever*, Case No. 08-459-JBC, 2010 WL 3470312

(E.D. Ky. Aug. 31, 2010), and *Todd v. Ky. Heartland Mortg., Inc.*, Case No. 2002-CA-002038-

MR, 2003 WL 21770805 (Ky. App. Aug. 1, 2003), that the Kentucky Consumer Protection Act

---

[5] *See Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 267-68 (Ky. App. 2008)
(citing K.R.S. §411.184 and *Williams v. Wilson*, 972 S.W.2d 260, 264 (Ky. 1998)).

does not apply to real estate transactions such as this one.  *See Mattox v. Wells Fargo, NA (In re Mattox)*, Bankr. No. 07-51925, Adv. No. 10-5041, 2011 WL 3626762 (Bankr. E.D. Ky. Aug. 17, 2011).  In so ruling, this Court rejected any attempt to distinguish Kentucky case law on the basis that none of the cases address a situation involving a securitized loan with multiple transfers of interest or a transfer of a note and assignment of a mortgage.  The allegations here are similar and the Court finds nothing to support a deviation from its prior ruling.  For this reason, the Court shall recommend to the District Court that the District Court grant the Defendant's Motion for Summary Judgment on the Plaintiff's Kentucky Consumer Protection Act claim (Count II).

　　　　**3.    Count III – Fraud/Intentional Misrepresentation.**  The Defendants moved for summary judgment on the Plaintiff's fraud/intentional misrepresentation claim (Count III) on the basis that the Plaintiff cannot prove that the Defendants fraudulently and intentionally misrepresented the fees and costs associated with the Loan because she has failed to show any evidence that she acted in reliance on the alleged misrepresentations.  To prevail on her fraud/intentional misrepresentation claim, the Plaintiff must prove by clear and convincing evidence that there was (1) a material misrepresentation; (2) which is false; (3) known to be false or made recklessly; (4) made with inducement to be acted upon; (5) acted in reliance thereon; and (6) injury.  *See United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).  If the Plaintiff prevails, she may recover actual and punitive damages.  *Id. at* 470.

　　　　The Defendants argue that the Plaintiff cannot have relied on their alleged misrepresentations.  According to the Defendants, the Plaintiff testified that she has disputed all charges assessed by the Defendants since 2003.  The Defendants further contend that the Plaintiff testified she was aware of Ocwen's alleged tactics of intentionally losing paperwork in order to accrue more fees.  The Defendants argue that continuously objecting to the alleged

misrepresentations, accusing the Defendants of inflating charges, and disputing her bills is not evidence of reliance on their alleged misrepresentations.

In addressing the Court's ability to enter a final judgment on Count III of the Plaintiff's Complaint, the Plaintiff takes the position that her fraud/intentional misrepresentation claim must be resolved in the claims allowance process because these misrepresentations induced her to enter into the 2004 and 2005 Forbearance Agreements, upon which the Defendants' rely as a defense to the Plaintiff's allegations.  A forbearance agreement is unenforceable if it is induced by fraud or bad faith.  *See Cook v. Cook*, 299 S.W.2d 261, 264 (Ky. 1957) (holding "forbearance to sue is a good consideration for a promise founded thereon" and "[i]t is only essential that the claim be asserted in good faith."); *see also Ruckel v. Baston*, 252 S.W.2d 432 (Ky. 1952) (holding forbearance to prosecute a doubtful claim asserted in good faith will constitute adequate consideration).  If the 2004 and 2005 Forbearance Agreements are enforceable, then the terms of the Forbearance Agreements will define the parties' contractual arrangement and have a direct effect on the Plaintiff's objection to the Defendants' claim.  If the Forbearance Agreements are unenforceable due to fraud or bad faith, then the Note and Mortgage will solely define the contract between the parties.  Therefore, the Plaintiff's claim for fraud/intentional misrepresentation as it relates to the 2004 and 2005 Forbearance Agreements must necessarily be resolved in the claims allowance process and the Court may, therefore, enter final judgment on Count III. The enforceability of the Forbearance Agreements is so integral to defining the parties' agreement and the resulting allowance/disallowance of Defendants' claims that the fact that Plaintiff *may* recover punitive damages *in the event* she prevails on Count III does not require a different result.

As for the Defendants' Motion for Summary Judgment on the Plaintiff's fraud/intentional misrepresentation claim, there are genuine issues of material fact that preclude entry of summary judgment.  The Plaintiff's fraud/intentional misrepresentation claim is dependent upon

24

whether the Plaintiff has been inappropriately assessed a variety of fees.  This, in turn, depends on whether the 2004 and 2005 Forbearance Agreements are enforceable.   The Court has already ruled there is a genuine issue of material fact in regards to the enforceability of the 2005 Forbearance Agreement.  Therefore, summary judgment is not appropriate as to Count III.

       **4.**      **Count IV – Conversion.**  Although neither party has moved for summary judgment on the Plaintiff's claim for conversion (Count IV), the Court must still address its authority to enter a final judgment on this cause of action.  The elements of conversion require proof that (1) the Plaintiff had legal title to the converted property; (2) the Plaintiff had possession of the property or the right to possess it at the time of conversion; (3) the Defendants exercised dominion over the property in a manner which denied the Plaintiff's rights to use and enjoy the property and which was to the Defendants' own use and beneficial enjoyment; (4) the Defendants intended to interfere with the Plaintiff's possession; (5) the Plaintiff made some demand for the property's return which the Defendants refused; (6) the Defendants' act was the legal cause of the Plaintiff's loss of the property; and (7) the Plaintiff suffered damage by the loss of the property.  *See Kentucky Assn. of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n. 12 (Ky. 2005) (citing 90 C.J.S. TROVER AND CONVERSION §4 (2004)).  The traditional measure of damages for conversion is the fair market value of the property at the time of the conversion, with interest, at the discretion of the fact finder, from the time of conversion.  *Batson v. Clark*, 980 S.W.2d 566, 574 (Ky. App. 1998).  Punitive damages are available as damages for conversion.  *See Craig & Bishop, Inc. v. Piles*, 247 S.W.3d 897, 906 (Ky. 2008) (citing *Hensley v. Paul Miller Ford, Inc.*, 508 S.W.2d 759, 762 (Ky. 1974)).

       The Plaintiff alleges that the Defendants converted her property by wrongfully and intentionally misapplying her payments and diverting them to unauthorized fees and costs.  If the Court determines that the Defendants took payments from the Plaintiff that she did not owe

because the Defendants did not have the authority to charge the Plaintiff the fees and costs of which she complains, and the Defendants did so with knowledge that they were not entitled to these payments, then the Court will necessarily resolve whether the Plaintiff's money has been converted.  Therefore, the Court shall enter a final judgment at the conclusion of trial on the disposition of Count IV.

     **5.**     **Count V – Breach of Implied Covenant of Good Faith.**  Similarly, neither party has moved for summary judgment on the Plaintiff's breach of the implied covenant of good faith (Count V).[6]  In Kentucky, within every contract there is an implied covenant of good faith and fair dealing and, to prevail on Count V, the Plaintiff must prove that the Defendants breached a duty to do "everything necessary" to carry out the contract.  *Harvest Homebuilders LLC v. Commonwealth Bank and Trust Co.*, 310 S.W.3d 218, 220 (Ky. App. 2010); *Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991).  The Plaintiff alleges the Defendants breached this implied covenant of good faith, arising from the 1981 Note and Mortgage, through the knowing misapplication of payments and charging of unauthorized fees in order to maximize profits and prevent the Plaintiff from discovering the errors.

     If the Defendants breached an implied covenant of good faith arising from the parties' contractual relationship, then the Plaintiff may be entitled to an equitable remedy in which the payments made by the Plaintiff and applied to unauthorized fees are appropriately credited to the Plaintiff's account.  *See Ranier*, 812 S.W.2d at 157 ("Basic fundamental fairness and equity both require the Bank to apply the $95,269.04 to the principal and interest on the original $125,000 secured note.").  In determining whether the contract was breached, and whether the Forbearance Agreements are enforceable due to bad faith or fraud, the Court will necessarily

---

[6] The Plaintiff stated in her initial Motion for Summary Judgment that she was moving for summary judgment on Count V of the Complaint, but she thereafter made no arguments and cited to no facts in support of summary judgment on Count V.  Therefore, the Court shall treat this statement as scrivener's error by the Plaintiff.

determine whether the Defendants acted in good faith and if not, whether the Plaintiff is entitled

to equitable relief.  Thus, as part of the allowing/disallowing of the Defendants' claim, the Court

will "necessarily resolve" whether the Defendants breached an implied covenant of good faith

which is part of the contract itself.  Therefore, the Court shall enter a final judgment on Count V

at the conclusion of trial.

> 6.      **Count VI – Negligent Misrepresentation.**  The Defendants have moved for

summary judgment on the Plaintiff's negligent misrepresentation claim (Count VI) on the same

basis as they moved for summary judgment on the Plaintiff's fraud/intentional misrepresentation

claim (Count III).  The Defendants argue that the Plaintiff cannot prove reliance on their alleged

misrepresentations.

Kentucky has adopted the Restatement (Second) of Torts §552, which defines negligent

misrepresentation as follows:

> (1) One who, in the course of his business, profession or employment, or in
> any other transaction in which he has a pecuniary interest, supplies false
> information for the guidance of others in their business transactions, is
> subject to liability for pecuniary loss caused to them by their justifiable
> reliance upon the information, if he fails to exercise reasonable care or
> competence in obtaining or communicating the information.

*Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 581 (Ky. 2004) (adopting

the RESTATEMENT (SECOND) OF TORTS §552 (1977)).  The tort of negligent misrepresentation in

Kentucky does not require privity of contract.  Rather, negligent misrepresentation arises from

an independent duty for which recovery in tort for economic loss is available.  *Id.* at 582.

The Plaintiff alleges that the Defendants acted negligently in supplying "false information

and/or fail[ing] to disclose information and fail[ing] to use reasonable care in communicating

information to Plaintiff regarding the servicing of her account."  She avers that she reasonably

relied on these negligent misrepresentations and they caused her to "overpay her obligation

under the Note and Mortgage."  The Plaintiff seeks damages in the amounts that she overpaid

on her Note and any consequential damages that arise out of the Defendants' alleged

wrongdoing.

It is unclear from the Plaintiff's allegations as to what facts she will rely upon to prove the

Defendants breached a duty of reasonable care owed to her independent of the duties imposed

by the contract.  The Plaintiff's allegations appear to arise from the parties' contractual

relationship, which is further emphasized by the fact that the Plaintiff seeks the recover the

amounts that she believes she overpaid as damages. To the extent that the Plaintiff is referring

to the same misrepresentations that she addresses in her fraud/intentional misrepresentation

claim (Count III), the Court will necessarily resolve whether any false misrepresentations were

made, the Defendants' frame of mind in doing so, and whether the Plaintiff relied on these

misrepresentations in determining the objection to claim.  Furthermore, the resolution of the

Plaintiff's objection to claim will determine if any amounts where overpaid; if so, the claim shall

be adjusted or denied accordingly.

Because the Plaintiff's claim for negligent misrepresentation appears to be so closely

related to the Court's determination of the parties' contractual arrangement, which includes the

Plaintiff's fraud/intentional misrepresentation claim (Count III) based on the 2004 and 2005

Forbearance Agreements, the Court shall, at this time, treat the Plaintiff's negligent

misrepresentation claim (Count VI) as a claim on which it may enter final judgment subject to

the proof actually offered at trial to prove this cause of action.

**7.    Count VII – Breach of Contract.**  The Plaintiff has moved for summary

judgment on her breach of contract claim (Count VII), arguing that the Mortgage and the Note

require payments to be applied to escrow, principal and interest and do not allow the

Defendants to direct the monthly payments to any other category of charges.  According to the

Plaintiff, the Defendants' application of the Plaintiff's payments to late charges, BPOs,

bankruptcy fees and expenses, title fees, property inspection fees, option products or interest

28

arrearage balances, breaches their contractual duties.  Moreover, the assessment of fees or expenses that were not authorized by the Note and Mortgage also breaches the contract.

In making a determination as to whether this Court may enter a final judgment on this claim, the Plaintiff argues that the breach of contract claim (Count VII) must be resolved for the Court to determine whether the Defendants' claim shall be allowed.  The Court agrees.  The Defendants have attached the Note and Mortgage to their Proof of Claim and rely upon it for their claim.  These documents define the parties' contractual relationship and the extent of the Defendants' claim.  A breach of contract, particularly of the magnitude as alleged by the Plaintiff, will determine to what extent the Defendants' claim shall be allowed, if at all.

While the Court may enter a final judgment on the Plaintiff's breach of contract claim, it will not do so at the summary judgment stage.  As previously addressed, there remain genuine issues of material fact as to the enforceability of the 2004 and 2005 Forbearance Agreements, which if enforceable shall play a pivotal role in defining the parties' contractual arrangement and the extent to which the charges assessed by the Defendants were authorized and/or the extent to which the Plaintiff has waived her claims.  Thus, the Court shall not grant summary judgment as to Count VII.

**8.    Count VIII.**    Count VIII, or "equity abhors forfeiture," is not a separate cause of action, but a request for a remedy, or equitable relief.  Whether the Plaintiff is entitled to equitable relief is dependent upon whether the Plaintiff will prevail on her causes of action and the relief that may be awarded.  Thus, no party has requested and the Court shall not address equitable relief in the context of these summary judgment motions.

**9.    Count IX – FDCPA.**    The Defendants have moved for summary judgment on the Plaintiff's FDCPA claim (Count IX) asserted against Ocwen.  Defendants argue that Ocwen is not subject to the FDCPA because it is a servicer of the loan, not a "debt collector" within the meaning of 15 U.S.C. §1692a(6)(F).  Plaintiff has also moved for summary judgment on Count

29

IX arguing that the Defendants have committed multiple violations of the FDCPA and they may not avail themselves of the defenses asserted.

Unlike the other counterclaims pled by the Plaintiff, this counterclaim arises in federal rather than state law.  *See* 15 U.S.C. §1692 *et seq.*  *Stern* addressed the Court's ability to enter final judgments on state law counterclaims; it makes no mention of a bankruptcy court's ability to enter final judgments on federal counterclaims properly referred to it by the District Court such as this one.  Because the Supreme Court did not address federal law counterclaims, and *Stern* is to be narrowly applied, the Court finds that the limitations set forth in *Stern* do not apply to the Plaintiff's FDCPA claim (Count IX) and the Court has the authority to enter a final judgment on this cause of action pursuant to 28 U.S.C. §157(b)(2)(C).

As for the parties' Motions for Summary Judgment, there is no dispute that the Plaintiff is a "consumer" in accordance with 15 U.S.C. §1692a(3).  Based on Ocwen's amended answer wherein it admits that Ocwen "oversee[s] collection of monthly payments from Plaintiff, passing on required cash flows to Successor Trustee Bank of America," it is apparent that Ocwen is a "debt collector"[7] in accordance with 15 U.S.C. §1692a(6) unless an exception applies.

Ocwen argues they are exempt from coverage under the FDCPA as a "debt collector" pursuant to 15 U.S.C. §1692a(6)(F)(i) and (ii).  According to these provisions, "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another" is not a "debt collector" if such activity is "(i) incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement" or for any such activity that "(ii) concerns a debt which was originated by such person."  The Court will address each exception separately.

    **(a)    15 U.S.C. §1692a(6)(F)(ii) - Assumption Of Debt While In Default**

---

[7] A "debt collector" is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. §1692a(6).

Ocwen argues that the Plaintiff was current under a forbearance agreement with HUD when it assumed the Loan, thus it can avail itself of the exception under §1692a(6)(F)(ii).  A "debt collector" does not include those who had responsibility for collecting the debt prior to the time it went into default.  *See Mattox*, 2011 WL 3626762, at *8 (*citing Alexander v. Omega Management, Inc.*, 67 F. Supp.2d 1052, 1055 (D. Minn. 1999) and *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985)).  A mortgage loan servicer does not qualify as a "debt collector" unless the mortgage loan servicer acquires the loan when it is in default or treats the loan as if it was in default when it acquired it.  *Id.* at *9.

The record reflects Ocwen assumed servicing the loan on January 1, 1997.  The payment ledger relied on by the Defendants shows that the Plaintiff was in default as of January 1, 1997, and Ocwen received its first payment after assuming the loan on June 9, 1997. Furthermore, Gina Johnson, Ocwen's representative, has confirmed in her deposition testimony that the payment which came due in June 1996 was still due when they assumed the loan.  But she also testified that when Ocwen assumed servicing, the Plaintiff was paying or performing under a payment plan with HUD, which Ocwen supports by reference to a documented payment plan dated March 26, 1996, signed by an officer of HUD but not signed by the Plaintiff.  Again, the Plaintiff disputes that she ever entered into this payment plan, or forbearance agreement, in 1996, but admits that she entered into such a plan in 1993 or 1994.

If a borrower is "current" in a payment plan when servicing is transferred to a subsequent servicer, that subsequent servicer would not be a "debt collector" subject to the FDCPA.  But if the borrower is not "current" on the forbearance agreement or payment plan, then the FDCPA does apply.  *See Bailey v. Sec. Nat'l Servicing Corp.*, 154 F.3d 384, 387-88 (7th Cir. 1998).  The parties dispute whether the Plaintiff was current and the evidence in the record is not conclusive where the document showing the payment plan is noy signed by the Plaintiff, nor does Ocwen's

31

own ledger show that the Plaintiff is current.  Summary judgment is not appropriate based on this exception.

### (b)      15 U.S.C. §1692a(6)(F)(i) – Bona Fide Fiduciary Obligation

Ocwen also argues that it is not a "debt collector" within the meaning of the FDCPA because its collection efforts are "incidental to a bona fide fiduciary obligation."  15 U.S.C. §1692a(6)(F)(i).  To prevail in this defense, Ocwen must establish not only that it is a "bona fide fiduciary" but also that its collection efforts are merely "incidental" to its fiduciary obligations.  *See Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1032 (9th Cir. 2009).

Fiduciary is defined as "'[o]ne who must exercise a high standard of care in managing another's money or property.'"  *Id.* at 1033 (citing BLACK'S LAW DICTIONARY (8th ed. 2004)).  "Fiduciary duty" is defined as "'a duty of utmost good faith, trust, confidence, and candor owed by a fiduciary (such as a lawyer or corporate officer) to the beneficiary (such as a lawyer's client or a shareholder); a duty to act with the highest degree of honesty and loyalty toward another person and in the best interests of the other person (such as the duty that one partner owes to another).'"  *Id.*

Assuming that Ocwen can establish that it is bona fide fiduciary, Ocwen must also establish that its actions in collecting the debt are "incidental" to its bona fide fiduciary obligation:

> The "incidental to" requirement means that the collection activity must not be "central to" the fiduciary relationship.  *See Wilson v. Draper & Goldberg*, 443 F.3d 373, 377 (4th Cir. 2006).  The function of this requirement is to exclude fiduciaries whose sole or primary function is to collect a debt on behalf of the entity to which the fiduciary obligation is owed.  Thus the requirement excludes lawyers or trustees acting solely or primarily to collect debts owed to their clients or beneficiaries.

*Id.* at 1034.

Ocwen has put forth little evidence to support its argument that it is a "bona fide fiduciary" or that the collection of the Plaintiff's debt is merely "incidental" to its collection efforts.  Ocwen has merely argued that because it is a servicer of the debt then it is necessarily a

fiduciary.  There remain genuine issues of material fact as to Ocwen's relationship with BOA
and its role in servicing the debt.  Based on the evidence before it, it is unclear to this Court that
Ocwen is truly a "bona fide fiduciary" or that the collection of the Plaintiff's debt is merely
"incidental" to those duties if it is.  Therefore, summary judgment is not appropriate based on
§1692a(6)(F)(i).

    10.    **Spoliation.**  Finally, the Plaintiff argues that she is entitled to summary judgment
on all her claims as a sanction for the Defendants' alleged spoliation of documents.  Spoliation
is an evidentiary sanction that permits the fact-finder to draw an adverse inference that is
unfavorable to the party accused of the spoliation.  To be entitled to such a presumption, the
Plaintiff must prove: (1) the party having control over the evidence had an obligation to preserve
it at the time it was destroyed; (2) the evidence was destroyed with a "culpable state of mind;"
(3) the destroyed evidence was relevant to a claim or defense for which the party seeks the
inference such that a reasonable fact finder could find that it would support that claim or
defense.  *See Beaven v. U.S. Dept. of Justice*, 622 F.3d 540, 553 (6th Cir. 2010); *Global
Technovations, Inc. v. Onkyo U.S.A. Corp. (In re Global Technovations, Inc.)* 431 B.R. 739, 778
(Bankr. E.D. Mich. 2010).

    To satisfy the culpable state of mind requirement for spoliation, the plaintiff must show
that the Defendants lost or destroyed evidence in bad faith.  *In re Global Technovations, Inc*.
431 B.R. at 782.  A sanction should only be imposed after a "'fact-intensive inquiry into a party's
degree of fault' under the circumstances including the recognition that a party's degree of fault
may 'rang[e] from innocence through degrees of negligence to intentionality.'"  *Beaven*, 622
F.3d at 554 (quoting *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988), *overruled on
other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009)).  The veracity of the
Defendants' stated reasons for the loss of such evidence or its destruction is an issue of
credibility.  *Id.*

The Plaintiff must show that the Defendants intentionally destroyed key documents in order for this Court to consider invoking its broad discretion to sanction the Defendants with a presumption that the absence of those documents warrants an adverse inference against them. Thus, there are genuine issues of material fact that will depend on the credibility of the representatives of the Defendants in explaining the absence of these documents.  For this reason, summary judgment based on spoliation shall be denied.

### Conclusion

For the foregoing reasons, the Court shall (a) recommend that the District Court grant partial summary judgment to the Defendant as to Plaintiff's claim for violation of the Kentucky Consumer Protection Act (Count II) and (b) otherwise deny the parties' cross-motions for summary judgment and proceed to hear those matters at trial following which the Court shall enter judgment and make the appropriate recommendations to the District Court in accordance with its analysis herein.  A separate order shall be entered accordingly.

Copies To:

J. Eileen Zell, Esq.

James P. McHugh, Esq.

Michael J. O'Hara, Esq.

Christopher Hill, Esq.

Kelly S.  Herzik, Esq.

34

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
*The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.*



**Signed By:**
***Tracey N. Wise***
**Bankruptcy Judge**
**Dated: Thursday, February 02, 2012 (tnw)**