## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF KENTUCKY
## COVINGTON DIVISION

IN RE:

PAMELA M. TOLLIVER                                    CASE NO. 09-21742

DEBTOR

PAMELA M. TOLLIVER                                         PLAINTIFF

V.                                               ADV. CASE NO. 09-2076

U.S. BANK, AS TRUSTEE FOR THE                          DEFENDANTS
CERTIFICATE HOLDERS OF THE
MORTGAGE PASS-THROUGH
CERTIFICATES 1997-R3 AND OCWEN
LOAN SERVICING, LLC

### MEMORANDUM OPINION

The primary issue is whether the Defendant Creditors, U.S. Bank, as Trustee for the

Certificate Holders of the Mortgage Pass-Through Certificates 1997-R3, and Ocwen Loan

Servicing, LLC, have a valid claim against the Plaintiff Debtor Pamela Tolliver for $836.24 in

unpaid principal, $19.11 in interest, and $4,697.83 in other fees and charges, for a total of

$5,553.18 in secured debt per Proof of Claim #14-1, based on a Note and Mortgage on the

Plaintiff's residence.  Related to this issue is whether the Plaintiff should prevail on her various

counterclaims to Defendants' proof of claim arising from the Plaintiff's allegations that the

Defendants overcharged her by adding unauthorized fees and expenses and improperly

crediting her payments.

The Court conducted a trial on these issues on April 19, 2012.  Upon consideration of

the parties' stipulation of facts, testimony and exhibits admitted into evidence, proposed findings

of fact and conclusions of law, and the record, as well as the arguments of the counsel, the

Court finds that although the Defendants have filed a proof of claim as *prima facie* evidence of that debt, the Plaintiff has produced sufficient proof to overcome the *prima facie* effect of that claim.  In turn, the Defendants have failed to put forth sufficient evidence to prove by a preponderance of the evidence that they are entitled to recover $5,553.18 in secured debt from the Plaintiff and therefore the Defendants' claim shall be disallowed pursuant to 11 U.S.C. §502.

Furthermore, although the Plaintiff has failed to meet her burden of proof to show that the Defendants violated the Kentucky usury statutes or that Ocwen is a "debt collector" pursuant to the Fair Debt Collection Practices Act, the Plaintiff has shown that the Defendants breached the terms of the Note and Mortgage by applying unauthorized late charges, costs and fees to her account and breached an implied contractual duty of good faith and fair dealing.  While the Defendants contend that they were authorized to make these charges and the Plaintiff has ultimately waived any claims she may have against the Defendants based on subsequent written forbearance agreements in 2004 and 2005, the agreements are unenforceable for lack of consideration where Ocwen misrepresented the status of the Plaintiff's Loan to fraudulently induce her to enter into these agreements when, but for Ocwen's unauthorized acts, the Plaintiff had paid her Loan in full.  The Plaintiff, having overpaid her Loan, is entitled to compensatory and punitive damages for the Defendants' breach of contract and implied covenant of good faith and fair dealing, fraud, and conversion.

## Facts

**A.      The Note and Mortgage**

Over thirty (30) years ago, on January 28, 1981, the Plaintiff and her former husband, Richard Mulligan (now deceased), executed a note in the principal amount of $21,950.00 (the "Note") payable to Monmouth Federal Savings and Loan Association of Newport ("Monmouth").

The Note has a fixed interest rate[1] of 10.875% and is scheduled to be paid in three hundred (300) monthly installments of $213.17, with a final due date of February 1, 2006.  The Note was endorsed and assigned that same day to Kentucky Housing Corporation.

Also on January 28, 1981, the Plaintiff executed and delivered to Monmouth a mortgage on real property in Campbell County, Kentucky (the "Mortgage"), to secure repayment of the Note.  Like the Note, the Mortgage was immediately assigned to Kentucky Housing Corporation.

Of particular importance to this litigation are the terms of the Mortgage that provide how the Note payments should be applied.  The Plaintiff's Mortgage specifically provides that the Plaintiff's monthly Note payments shall be applied in the following order: (1) premium charges under the contract of insurance with the Secretary of Housing and Urban Development, or the monthly charge (in lieu of mortgage insurance premium), as the case may be; (2) ground rents, taxes, special assessments, fire, and other hazard insurance premiums; (3) interest; and (4) principal.

Also key to this litigation are the terms of the Note and Mortgage related to other fees and charges.  The Note allows late charges of $8.53 per late payment, or $0.04 cents for each dollar of each payment more than fifteen (15) days in arrears.  Neither the Note nor the Mortgage allows for recovery by the lender or holder of any costs or fees associated with default and foreclosure.  The Note and Mortgage are collectively referred to as the "Loan."

Almost fifteen years after the inception of the Loan, Kentucky Housing Corporation assigned the Plaintiff's Loan to the Department of Housing and Urban Development ("HUD") on February 28, 1995 (the "KHC Assignment").  The KHC Assignment recites the principal balance of the Mortgage as "the sum of $16,867.86, together with interest thereon from May 1, 1994 at the rate of 10.875% per annum..."

---

[1] The interest on the Plaintiff's Note was predetermined  at the outset of the Loan based on the amortization over the life of the loan and interest therefore does not accrue on a daily basis.

**B.      Ocwen's Servicing of the Loan**

Almost two years after the Loan was assigned to HUD, HUD sold the Loan to one of the Defendants herein.  Ocwen Federal Bank, FSB, a federal savings bank and predecessor-in-interest to the Defendant Ocwen Loan Servicing, LLC ("Ocwen Loan Servicing") (collectively referred to herein as "Ocwen"),[2] and Blackrock Capital Finance, LLC, purchased the Loan effective January 1, 1997.  HUD assigned the Loan to Ocwen on March 7, 1997, with an agreement in the Assignment that "any changes in the payment obligations under the Note by virtue of any forbearance or assistance agreement, payment plan or modification agreement agreed to by U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ("HUD"), whether or not in writing, is binding upon the Assignee/Payee, its successors and assigns."

From this point forward, Ocwen proceeded to mishandle the servicing of the Plaintiff's Loan by misapplying her payments contrary to the terms of the Note and Mortgage and assessing unauthorized fees and charges.  This forced the Plaintiff into a constant state of default, allowing Ocwen to profit by continuing to assess more fees and charges based on her default status.  Ocwen knew or should have known that it could not charge these fees and charges, yet Ocwen misrepresented to the Plaintiff that her Loan was in default thereby forcing the Plaintiff to enter into a series of meaningless oral and written forbearance agreements, none of which allowed her to cure her alleged default and two of which contained provisions that Ocwen ultimately argues excuses its misbehavior.  These provisions, found in the 2004 and 2005 written forbearance agreements, allowed Ocwen to charge these unauthorized fees to the Plaintiff's account and required the Plaintiff to waive any claims it had against Ocwen.  But for Ocwen's misapplication of her payments, and contrary to Ocwen's representations, the Plaintiff

---

[2] Ocwen Federal Bank, FSB first came into existence on January 1, 1997.  It ceased to be a federal savings bank and become Ocwen Loan Servicing, LLC effective July 1, 2005.

had actually paid her Loan in full by October 2004.   As a result of Ocwen's actions, the Plaintiff

has overpaid her Loan by thousands of dollars.

       (1)     **The Proof at Trial**

The facts of this case turn on two key categories of evidence, neither of which the Court

finds credible: (1) Ocwen's Loan documentation and (2) the testimony of Ocwen's corporate

representative and senior loan analyst, Gina Johnson.

        (i)     **Ocwen's Loan Documentation**

Ocwen assumed servicing of the Loan in its capacity as owner and holder of the Loan on

January 1, 1997.  When Ocwen acquired the Loan from HUD, it received servicing data from the

prior servicer, PNC Mortgage Company, by an electronic transfer directly from HUD to Ocwen,

otherwise referred to as the "boarding" of the Loan.  Ocwen's quality control personnel then

manually reviewed the information to make sure that it was inputted correctly.  At the time the

Loan boarded, HUD did not transmit all the Loan servicing documents in its possession to

Ocwen.  If specific documentation was needed, Ocwen generally obtained it by email request to

HUD.  However, Ocwen had difficulty obtaining the documentation relating to the Plaintiff's Loan

and was unable to produce a Mortgage Loan Schedule showing the unpaid principal balance of

the Loan upon boarding, any prior servicing records (other than two blank pages from PNC

Mortgage Company) or other evidence of the status of the Loan, beyond the Assignments

previously discussed.

Although there is no servicing history prior to January 1, 1997, Ocwen relies on its Loan

History and Payment Reconciliation Records ("Loan History") for the status of the Loan at

boarding and an accounting of the Loan.  Ocwen's Loan History is a payment ledger that is

supposed to contain a full accounting of all payments made on the Loan since the inception of

its servicing and how those payments were applied to the various obligations on the Loan.  The

Loan History reflects the date a payment is due, the date the payment was made and how the

payment was applied to principal, interest, and escrow, as well as other various charges and

fees, while also keeping a running balance on unpaid principal, interest, and escrow.

Ocwen interprets its Loan History in conjunction with its Comment Log.  The Comment

Log is a document generated by Ocwen that contains notations from any Ocwen employee that

handled the Plaintiff's Loan.  The Comment Log is used to memorialize the activities on the

Loan during Ocwen's servicing and according to Ocwen, would contain information regarding

any communications Ocwen had with the borrower, payments made by the borrower, the

assessment or waiver of fees, and any "internal bookkeeping" by Ocwen in the assessment or

credit on the account.  In other words, where the Loan History provides the basic framework, or

skeletal history of the Loan, the Comment Log is the flesh that fills in the details.

In knowing the purpose of the Loan History and Comment Log, it is reasonable to expect

that these documents, when reviewed together, would clearly explain the status of the Loan at

boarding and Ocwen's servicing of the Loan thereby allowing the Court to trace the history of

the Loan and determine whether Ocwen's claim against the Plaintiff is justified.  Instead of

providing clarity, Ocwen's Comment Log and Loan History are conflicting and confusing.  When

reviewed together, the documents clearly contradict each other, making them largely unreliable.

### (ii)   The Witnesses

The Defendants produced only one witness, Gina Johnson, in support of their proof of

claim as well as in their defense against the Plaintiff's counterclaims.  Ms. Johnson attempted at

trial to explain Ocwen's inconsistent documentation and its actions.  While admitting that the

Note and Mortgage did not permit Ocwen to assess many of the charges it did on the Plaintiff's

account, Ms. Johnson testified that the written forbearance agreements signed by the Plaintiff in

2004 and 2005 permitted Ocwen to charge the fees and expenses otherwise prohibited by the

Note and Mortgage and waived any claims that the Plaintiff may have against Ocwen.  Ms.

Johnson further testified that Ocwen's accounting of the Plaintiff's Loan as evidenced by the

Loan History and Comment Log was mostly accurate, admitting only to a few errors as to

charges applied to the Loan and a mistake made by Ocwen as to the "interest arrearage

balance," which she insists was ultimately resolved in the Plaintiff's favor.  Ms. Johnson

concluded that, considering her explanations, Ocwen's documents are reliable and support

Ocwen's proof of claim.

The Plaintiff's expert, Margot Saunders, an employee of the National Consumer Law

Center and expert in consumer and mortgage finance and credit math, wholly disagreed with

Ms. Johnson.  Ms. Saunders reviewed Ocwen's documents regarding the Plaintiff's Loan,

including its Loan History and Comment Log, and testified that in her opinion, the documents

are contradictory and unreliable.  According to Ms. Saunders, the financial information listed on

Ocwen's Loan History at boarding is inconsistent and conflicting.  Ms. Saunders further testified

that a review of Ocwen's documents show that within months of boarding the Loan, Ocwen

proceeded to misapply the payments on the Plaintiff's Loan and charge and collect expenses

and fees not authorized by her Note and Mortgage.  Ms. Saunders opined that not only did

Ocwen misapply the Plaintiff's payments to fees and charges not allowed by the Note and

Mortgage, but Ocwen also misapplied the Plaintiff's payments to an unauthorized "interest

arrearage balance," allegedly consisting of interest arrearage owed by the Plaintiff at the time of

boarding and "securitized interest" advanced by Ocwen in November 1997 to enable it to

securitize and the sell the Loan.  Ms. Saunders concluded that despite her doubt about the

figures listed by Ocwen in its Loan History at boarding, even assuming the highest possible

unpaid principal balance at the inception of Ocwen's servicing, the Plaintiff had overpaid her

principal and interest obligations to the Defendants in the amount of $3,839.05 as of June 19,

2009 due to Ocwen's assessment and collection of these unauthorized charges.

The Plaintiff testified that Ocwen's continued misapplication of the Plaintiff's payments

kept the Plaintiff's Loan in a constant state of default, which caused the Plaintiff over a decade

of distress.  The Plaintiff is a single unemployed mother of six children, two of which currently

reside with her and one of which is severely disabled.  She testified that although she believed

that she was current on her Note during Ocwen's servicing of her Loan, and made multiple

inquiries questioning Ocwen's reported status of her Loan, she signed a series of written

forbearance agreements in 2003, 2004, and 2005 (and entered into numerous unwritten

forbearance agreements) in an attempt to save her home based on Ocwen's representations

that she was in default.  Notwithstanding her completion of these forbearance agreements,

Ocwen continued to insist that her Loan was in arrears, despite her protests to the contrary.

Overwhelmed by the 24-hour care of her disabled son, the Plaintiff was left with little

time to devote to fighting Ocwen.  The Plaintiff testified that despite these constraints, she

managed to seek and receive help multiple times from various social service agencies including

the Catholic Social Services, the Brighton Center, Inc., and Legal Aid.  Earlene Johnson, a

certified housing counselor from Brighton Center, Inc., testified that after reviewing

documentation on the Plaintiff's Loan and finding what she believed to be illegal fees added to

her account by Ocwen and misapplication of the Plaintiff's payments, she too attempted to

discuss the discrepancies in the Loan with Ocwen but was unable to even reach an employee of

Ocwen to discuss her concerns.

Weighing the reliability and the credibility of the witnesses and evidence at trial, what is

apparent to this Court is that despite Ms. Johnson's valiant attempts to explain Ocwen's

accounting, she cannot save Ocwen from the clear evidence of its gross mishandling of the

Plaintiff's Loan.  Ocwen's records, where they exist, show a series of servicing errors by Ocwen

that cannot be explained or excused.   Ms. Johnson offered multiple explanations about the lack

of prior servicing records and the inconsistencies in Ocwen's Comment Log and Loan History,

but for the reasons explained further herein, Ms. Johnson's testimony, which was also

contradictory, confusing, and ultimately not reliable, cannot save Ocwen from its own

misbehavior.

**C.      Ocwen's Mishandling of the Plaintiff's Loan**

   **(1)      The Status of the Loan at Boarding**

Because Ocwen was unable to produce any prior servicing records, the only evidence of

the status of the Loan at boarding introduced by Ocwen is based on Ocwen's records.  Ocwen's

Loan History lists the following due on the Loan as of January 1, 1997, or the time of boarding:

(1) a remaining principal Loan balance of $16,867.86; (2) an "interest arrearage balance" of

$2,915.86; (3) a negative late charge balance of $352.68; and (4) an escrow balance of

$185.71.  According to Ocwen's Loan History, the Loan was due for the July 1, 1996 contractual

payment of $265.86.[3]

Before launching into a discussion of the reliability of the financial information listed in

Ocwen's Loan History at boarding, the Court must first address a dispute between the parties

regarding whether the Plaintiff's Loan was in arrears or current when Ocwen assumed servicing

it, which is a key issue that affects the Plaintiff's counterclaim that the Defendants violated the

Fair Debt Collection Practices Act ("FDCPA"), or 15 U.S.C. §1692 *et seq.*

   **(i)      In Arrears or Current?**

The parties dispute whether the Plaintiff was current on her Loan at the time of boarding.

The Plaintiff insists that because Ocwen's records show her Loan was due for the July 1, 1996

payment, the Loan was not current at the time Ocwen assumed servicing it for the purposes of

the FDCPA.  Ocwen does not dispute that the Loan was in arrears under the original Loan

---

[3] The parties stipulated that the total amount of the Plaintiff's monthly contractual payment for escrow,
interest and principal from March 1, 1981 through May 1, 2000 was $265.86 ($52.73 to escrow and
$213.13 to principal and interest).  Although the Loan documents recite the principal and interest
installment payments as $213.17, the Defendants inexplicably charged the Plaintiff only $213.13 for
principal and interest in each monthly installment payment.  The $265.86 monthly payment does not take
into account the monthly HUD premium charges referenced in the Note and Mortgage because once the
loan was sold by HUD to Ocwen and legal title was transferred on March 7, 1997, HUD's insurance
premiums were no longer due under the Mortgage.

terms, but argues that the Plaintiff's Loan was considered current under the FDCPA as she was paying pursuant to a forbearance payment plan with HUD.

In support of its contention, Ocwen introduced into evidence a copy of a HUD payment plan, signed by HUD on March 26, 1996, but unsigned by the Plaintiff or Richard Mulligan (the "1996 Payment Plan").  The 1996 Payment Plan provided for payments by the Plaintiff in the amount of $275.00 per month starting on April 1, 1996 and continuing through March 31, 1997.  The Plaintiff argued that she did not sign the 1996 Payment Plan and it was not in effect at the time the Loan boarded.

Although the 1996 Payment Plan was not signed by the Plaintiff, Ocwen and the Plaintiff acted as if the Plaintiff was performing pursuant to a payment plan with HUD similar to the 1996 Payment Plan.  The Plaintiff testified that she did not enter into the 1996 Payment Plan, but that sometime before Ocwen acquired the loan she was making loan payments pursuant to a payment plan of $275.00 per month.  Likewise, the first payment mentioned in Ocwen's Comment Log is a payment due on February 1, 1997 in the amount of $275.00.

Moreover, the evidence shows that the Plaintiff had several discussions with Ocwen about these $275.00 payments, which Ocwen treated as forbearance payments.  On April 17, 1997, the Plaintiff had her first telephonic contact with Ocwen during which she informed Ocwen that the last payment made on the account for the February 1, 1997 payment was sent to HUD in February 1997, in the amount of $275.00.  The Plaintiff told Ocwen the March and April 1997 payments in the total amount of $550.00 ($275.00 per month) had been made.

On May 8, 1997, Ocwen sent the Plaintiff a notice of default for failure to pay two months of forbearance payments in the total amount of $550.00 as of February 1, 1997.  On May 15, 1997, the Plaintiff advised Ocwen that she had paid the March 1, April 1, and May 1, 1997 payments and the February 1, 1997 payment had been sent to HUD.  On May 21, 1997, the Plaintiff further advised Ocwen that she had mailed the April 1 and May 1, 1997 payments but

the check had not cleared, so she placed a stop payment on the check and asked for a new check to be reissued.

In addition to these discussions, Ocwen's Comment Log further reflects that the Plaintiff's Loan was in a "Ferrell period" until February 1998.  According to Ms. Johnson, this "Ferrell" period was a period of forbearance during which the Plaintiff was entitled to make whatever payment she could afford on the Loan without risk of foreclosure.[4]  Finally, Ms. Johnson testified, and Ocwen's Comment Log reflects, that this HUD forbearance payment plan was "completed" in June 1997.

Based on the evidence presented by both parties, the Court finds that the Plaintiff was timely making payments of $275.00 per month pursuant to a forbearance payment plan with HUD at the time Ocwen purchased and assumed servicing the Loan on January 1, 1997.  The effect of this finding on the Plaintiff's counterclaim based on the FDCPA is discussed more fully herein.

(ii)      The Balance of the Loan at Boarding

Although the evidence supports a finding that the Plaintiff was timely making payments pursuant to a forbearance payment plan with HUD on January 1, 1997, the Court does not find that the unpaid principal Loan balance listed in Ocwen's Loan History as of that date is accurate.

The only evidence before the Court as to the balance of the Loan at boarding is (1) Ocwen's records; and (2) Ms. Saunders' conclusions about the balance based on her review of these records.  Ocwen's Loan History shows that as of January 1, 1997, the Plaintiff's unpaid principal balance was $16,867.86; however, Ms. Saunders opined following her review of Ocwen's records that they were so "internally inconsistent and incredibly confusing" as to the

---

[4]The "Ferrell period" refers to a consent decree in the case of *Ferrell v. Harris*, No. 73-C-334 (N.D. Ill. 1976).  *See Epps v. Lomas Mortgage USA, Inc. (In re Epps)*, 110 B.R. 691, 694 (E.D. Pa. 1990).

starting balance that it was "virtually impossible" to determine the starting balance at the time of

boarding.  Ms. Saunders testified that because of these inconsistencies, she made a series of

assumptions that led her to three different conclusions with three different starting principal

balances depending upon which source from Ocwen she relies.

The Court agrees with Ms. Saunders that because of their inconsistency, Ocwen's

records are not reliable.  The Court further finds the assumptions and conclusions made by Ms.

Saunders to be credible, adopts Ms. Saunders' most conservative conclusion, and finds that the

unpaid principal Loan balance as of January 1, 1997, is $16,863.34.[5]

### (2)    Ocwen's Misapplication of Payments

Ocwen began misapplying the Plaintiff's payments almost immediately after it purchased

and began servicing the Loan.  Ocwen's misbehavior started with its application, or lack thereof,

of the Plaintiff's $275.00 monthly forbearance payments.

First, there is no evidence that the forbearance payment due for January 1997 was ever

applied to the Plaintiff's account.  Second, if the January 1997 payment was applied to the

Plaintiff's Loan prior to Ocwen's purchase of the Loan, there is no evidence that Ocwen applied

the April and May payments of $275.00.  According to Ocwen's Comment Log, a total of

$550.00, for the February 1, 1997, and March 1, 1997 forbearance payments, was credited to

the Plaintiff's account for the payments due on July 1, 1996 and August 1, 1996 collectively.

But Ocwen's Loan History confuses this issue as these payments are reflected on the Loan

History as payments of $265.86, not $275.00, paid on June 9, 1997 and credited towards the

---

[5] Ms. Saunders used the highest unpaid principal balance of $16,863.34 based on a basic amortization of the Plaintiff's Loan per the terms of the Note and her acceptance of Ocwen's contention that the unpaid principal balance had not changed from the time of the KHC Assignment and the time the Loan boarded with Ocwen, with one deviation.  According to Ms. Saunders, if the Plaintiff had made every payment on time and in the proper amount, then she would have owed $16,863.34 after the June 1, 1994 payment. However, the KHC Assignment, which cites the unpaid principal balance of $16,867.86, the same as the unpaid principal balance that boarded with Ocwen, states that the Plaintiff owes payments beginning on May 1, 1994.  Regardless Ms. Saunders calculations are based on a more conservative analysis than stipulated by the parties, or that the Plaintiff was due for the July 1, 1996 payment.

July 1, 1996 and August 1, 1996 payments, respectively, for principal, interest, and escrow, with a "forbearance payment" of $18.28 credited to a "suspense balance."[6]  Adding to the confusion is that Ocwen's Comment Log and Loan History further indicate that this payment of $550.00 was reversed on July 21, 1997 because the bottom half of the check was missing.  Ms. Johnson testified that this reversal was fixed at a later date and that the payments had been properly re-posted to the account.  Despite the confusion generated by the Loan History and Comment Log as to the February and March 1997 forbearance payments, there is no evidence in the Loan History that the April or May 1997 forbearance payments were applied to the Plaintiff's account, although the Comment Log states that as of June 9, 1997, the "forbearance plan" with HUD was "complete."

If the forbearance payment plan with HUD was truly "complete," then all of the Plaintiff's forbearance payments should have been applied to the Plaintiff's account and any arrearage and unpaid principal balance updated to reflect the payments.  Yet there is no evidence of this.  According to Ms. Saunders, the unpaid principal balance as of June 1, 1997 should have been $14,308.15 if the forbearance plan was complete and the Loan was paid up.  Yet at that time, Ocwen's Loan History shows an unpaid principal balance of $16,746.78, only $121.08 less the unpaid principal balance at boarding on January 1, 1997, based on an application of only two forbearance payments made by the Plaintiff.  Furthermore, although Ocwen deemed the forbearance plan with HUD "complete" according to its Comment Log, it did not thereafter treat the Plaintiff's Loan as current.  Rather, two days after the June 9, 1997 entry in its Comment Log that the forbearance plan was "complete," Ocwen generated a billing notice showing the account past due.

---

[6] Ocwen did not explain the purpose of a "suspense balance" or the reason $18.28 of the payment was applied to this category.

In an attempt to explain the misapplication of these payments, Ms. Johnson testified that while the Plaintiff was "performing" pursuant to her forbearance payment plan, and even completed it, she was not "contractually current" as of June 9, 1997, because she still owed payments due for September 1, 1996.  This Court finds this explanation entirely incomprehensible.  Ms. Johnson's distinction of "contractually current" as compared to "performing" pursuant to a forbearance plan is not reflected in Ocwen's records.  Moreover, this explanation is inconsistent with Ocwen's insistence (and this Court's finding) that the Plaintiff was current on her Loan at the time of boarding based on her payments under a forbearance payment plan despite the Loan being past due on principal and interest.  Ocwen cannot have it both ways.  The concepts of "contractually current" and "performing pursuant to a forbearance plan" appear to be manufactured in an attempt to offer an after-the-fact excuse for the inconsistency in Ocwen's records.

The evidence shows that the Plaintiff understood the forbearance agreements to be modifications of the current Note and Mortgage whereby the Plaintiff's payments were increased to cure her default.  There is no evidence that Ocwen ever represented to her otherwise.  In fact, the written forbearance agreements upon which Ocwen later relies (to be discussed more fully herein) represent exactly what the Plaintiff believed.  The Court finds Ms. Johnson's explanation a poor attempt to explain Ocwen's mishandling of the Loan.

Ocwen's mishandling of the Loan continued even after the Plaintiff once again cured her "default" in June 1997.  The Plaintiff did not make another payment on the Loan until August 1997.  On August 4, 1997, Ocwen sent the Plaintiff an acceleration warning indicating that she owed as of that date: (1) $2,983.82 in principal and interest; (2) $321.29 in escrow; and (3) $25.00 in insufficient fund charges, for a total "reinstatement" amount of $3,330.11.  On August 25, 1997, Ocwen's Comment Log shows the Plaintiff advised Ocwen that Catholic Social Services had sent a check in the amount of $1,329.00.  On August 26, 1997, the check was

14

received and the amount of $265.86 per month was applied to "forbearance payments" due for May through September 1997 per Ocwen's Comment Log.  That same day, Ocwen noted in its Comment Log that this "forbearance plan" was "complete."

In contrast, Ocwen's Loan History reflects five payments of $265.86[7] paid on August 26, 1997.  Each of these five payments was applied to separate payments due on July 1 through November 1, 1996 (payments of which should have been satisfied by the completion of the Plaintiff's payment plan with HUD), thus leaving the Plaintiff in arrears by several months, despite completing two forbearance plans since Ocwen began servicing the Loan.

On September 17, 1997, less than a month after the $1,329.00 payment, Ocwen's Comment Log shows a billing notice was sent to the Plaintiff reflecting a past due balance of zero, indicating that the Plaintiff was finally current on her Loan.  But the Comment Log conflicts with Ocwen's Loan History, which reflects that the Plaintiff's account was still due for the December 1, 1996 payment and was therefore nine (9) months in arrears.

The Plaintiff's next payment was due on October 1, 1997.  The Plaintiff paid a total of $265.86 on October 9, 1997, and the payment was applied, according to Ocwen's Comment Log, as a "forbearance payment."  Once again, Ocwen noted in its Comment Log that the "forbearance plan" was "complete."  Despite "completing" yet another "forbearance plan," Ocwen's Loan History shows that the October 9, 1997 payment was applied to the December 1, 1996 balance still due and owing, even though Ocwen represented to the Plaintiff in September 1997 that her past due balance was zero according to its Comment Log.

(3)     Ocwen's "Mistake" – The Securitized Interest Arrearage Balance

On November 1, 1997, the Plaintiff's Loan was securitized and Bank of America ("BOA"), as Trustee for the Certificate holders of the Mortgage Pass-through Certificates 1997-R3,

---

[7] Five payments of $265.86 equals $1,329.30, slightly more than the amount remitted to Ocwen by Catholic Social Services on the Plaintiff's behalf.

15

became the owner and holder of the Loan.[8]  Ocwen continued servicing the Loan on BOA's

behalf pursuant to a Pooling and Servicing Agreement dated November 1, 1997.

Until the securitization of the Loan, Ocwen's Loan History showed the Plaintiff due for

the January 1, 1997 payment.  The unpaid principal balance as of October 9, 1997, the last

entry prior to securitization, was $16,497.97.  Despite boarding the Loan with an interest

arrearage balance of $2,915.86, the interest arrearage balance as of October 9, 1997 was zero

and had been inexplicably reflected as zero in the Loan History since the first payment of

$265.86 posted on June 9, 1997.

On the next payment entry made after the securitization of the Loan, Ocwen's Loan

History shows a payment due date of November 1, 1997, rather than January 1, 1997 per the

prior entry.  Ms. Johnson explained this seemingly inexplicable jump in the payment due date

was the result of a "corporate advance" by Ocwen.  According to Ms. Johnson, Ocwen

advanced the Plaintiff ten (10) months of interest due by the Plaintiff for January through

October 1997, in the amount of $1,457.93, and then set a new contractual due date of

November 1, 1997, thus supposedly bringing the Plaintiff's Loan, in Ocwen's terms,

"contractually current."  While Ocwen advanced the Plaintiff interest, it did not advance her the

ten (10) months of principal due on the Loan; rather, the unpaid principal balance as of

December 23, 1997 remained $16,497.97, the same balance for October 9, 1997 immediately

prior to securitization.  The unpaid principal Loan balance was then adjusted by a payment of

$265.86 made on December 23, 1997 to $16,434.35 and applied to the payment due for

November 1, 1997.

---

[8] Defendant U.S. Bank as Trustee for the Certificate holders of the Mortgage Pass-through Certificates
1997-R3 is the current holder of the Note and Mortgage.  During the pendency of this case, U.S. Bank
replaced the original Defendant BOA as the party entitled to enforce the Note and Mortgage.  An Agreed
Order was entered on April 18, 2012 substituting U.S. Bank as the real party-in-interest.

According to Ms. Saunders, there was no law, regulation, contractual right, or rule of common sense that permitted Ocwen to arbitrarily assign a first payment due date to her Loan, advance the due date by ten months, and then charge the Plaintiff interest for ten months while dunning her repeatedly until she paid this "interest arrearage balance."  Moreover, despite Ms. Johnson's testimony that Ocwen advanced the Plaintiff ten (10) months of interest, Ocwen's Loan History shows no interest arrearage immediately after securitization of the Loan.  In fact, Ocwen's Loan History shows the interest arrearage remained at zero through securitization. When asked to explain why the interest arrearage balance is zero in Ocwen's Loan History despite Ms. Johnson's testimony that Ocwen advanced the Plaintiff ten (10) months of interest, Ms. Johnson testified that Ocwen intended to add the securitized interest of $1,457.93 to the interest arrearage balance that boarded with the Loan of $2,915.86, for a total interest arrearage balance of $4,373.79.  The only reference to this "corporate advance" is in Ocwen's Comment Log, which merely reflects a "corporate advance" of $1,457.93 and a new due date of November 1, 1997; there is no entry reflecting Ocwen's intent or a new interest arrearage balance of $4,373.79.

The Loan History shows that no interest arrearage from either HUD or Ocwen was assessed to the Plaintiff at the time of securitization.  Rather, the securitized interest created by Ocwen materialized, seemingly out of thin air, years later, in Ocwen's Loan History.  After years of showing a zero interest arrearage balance, the amount of $1,457.93 reappeared on Ocwen's Loan History on February 13, 2001 with absolutely no explanation in Ocwen's Comment Log, where explanations such as this were, according to Ms. Johnson, supposed to be memorialized. When once again asked to explain yet another discrepancy in Ocwen's records, Ms. Johnson finally admitted that Ocwen made a "mistake" and instead of adding the securitized interest of $1,457.93 to the HUD interest arrearage that boarded on January 1, 1997, Ocwen inadvertently subtracted Ocwen's securitized interest from the HUD interest arrearage.  Ms. Johnson further

17

testified that this occurred because of the migration of data from an old computer system to a new computer system in 2001 and the difference has since been "waived" by Ocwen.   The new interest arrearage balance as of February 13, 2001 is exactly half of the interest arrearage balance shown at boarding.

Ocwen's Comment Log makes no reference to this "mistake" or "waiver."  There is no evidence that the Plaintiff was ever informed of Ocwen's "mistake" or "waiver."  This is not surprising since Ms. Johnson confessed at trial she only discovered the "mistake" in preparation for trial, when she finally undertook the very serious task of trying to reconcile the Loan with a forensic accounting.

In conclusion, the Court finds no credible evidence of an interest arrearage balance at boarding or a basis for the assessment of the securitized interest balance.  The application of this interest arrearage balance is nothing more than a farce.  Ocwen cannot substantiate its existence at the time of boarding, nor can Ocwen credibly explain or justify its application, particularly following the securitization of the Plaintiff's Loan.  Thus, the Court finds that Ocwen's assessment of the interest arrearage balance, in any amount, is improper and further evidence of Ocwen's mishandling of the Loan.

### (4)    Ocwen's Assessment of Impermissible Late Charges, Fees and Costs

Ocwen not only mishandled the Loan by failing to apply the Plaintiff's payments correctly and assessing and collecting from the Plaintiff an unsubstantiated interest arrearage balance, but also in systematically assessing late charges, fees and costs in complete disregard of the terms of the Plaintiff's Note and Mortgage.  For example, on February 18, 1998, after the Plaintiff's deceased ex-husband, Richard Mulligan, filed bankruptcy, Ocwen obtained relief from stay and charged the related bankruptcy fees and costs to the Plaintiff's account, despite disallowance of the claim in Mr. Mulligan's bankruptcy.  Application of these fees and costs was in clear contravention of the terms of the Plaintiff's Loan.

18

From 1998 through the middle of 2003, Ocwen's records show that the Plaintiff's Loan remained continuously in successive and meaningless "forbearance plans," none of which were in writing and none of which appeared to allow the Plaintiff to actually cure her default.  During this time Ocwen assessed the Plaintiff a series of late charges, many of which were in excess of the late charges allowed per the terms of the Loan.   Ocwen initially assessed $10.63 in late charges per month at various times in 1997 through 2000.   In May 2000, the late charge increased to $13.36 and the same late charge was assessed for the months of June and July 2000 before the late charge decreased to $8.53, which was assessed thereon at various times through 2003.

The parties stipulated that the appropriate late charge per the terms of the Mortgage was $8.53, or four percent (4%) of the principal and interest payment.  Ocwen explains that the assessments greater than $8.53 are based on four percent (4%) of the increased forbearance payments, which Ocwen argues was allowed as the Mortgage merely referred to late charges in the amount of 4% of the "payment."  Setting aside the issue of whether these forbearance payments were even justified based on Ocwen's mishandling of the Plaintiff's payments, the only "payment" referenced in the Mortgage is the monthly installment payment of $213.17.  The parties stipulated that $8.53 is the appropriate late charge.  Furthermore, Ocwen's explanation for these late fees is at odds with Ocwen's Loan History, which shows the payments made by the Plaintiff in late 2000 and through 2003, when Ocwen decreased the late charges to $8.53, were generally in excess of $300.00.  Ocwen's explanation is not supported by the evidence and it is clear that Ocwen overcharged, collected, and applied to the Plaintiff's account a total of $71.19 in impermissible late charges between 1997 and 2003.

More disturbing than Ocwen's assessment of unauthorized late charges is that between January 1, 1997 and December 31, 2000, Ocwen assessed a total of $352.68 in late charges, which is the exact same amount of late fees which supposedly boarded from HUD, albeit in a

19

negative number, in January 1997.  This number reflects the total amount of late charges assessed by Ocwen up until the migration of data from Ocwen's old system to its new system in 2001, which, according to Ms. Johnson, resulted in the securitized interest arrearage "mistake." Like the alleged interest arrearage balance of $2,915.86 from HUD, this negative late charge amount of $352.68 disappeared upon the very next entry in the Loan History with no explanation in Ocwen's records.  Not surprisingly, Ms. Johnson's testimony is contradictory on this issue as well, as Ms. Johnson previously testified in her deposition that the late charges were incurred while Ocwen serviced the Loan (despite discovery responses that indicated the late charges boarded from HUD), but at trial testified that the late charge balance accrued with HUD and not Ocwen.

In addition to the impermissible late charges, Ocwen continued to charge the Plaintiff for various other unauthorized fees and charges during its servicing of the Loan.  From 1997 through 2009, Ocwen's records show a total of thirteen (13) Broker Price Opinion ("BPO") assessments made to the Plaintiff's account.  One assessment was ultimately credited to the Plaintiff's account as a "waiver" on May 2, 2005 according to Ms. Johnson, but once again the Comment Log shows no such waiver or adjustment despite Ms. Johnson's testimony that such waivers or internal bookkeeping adjustments would be found in the Comment Log.  Although Ocwen's policy is that a BPO is assessed only: (1) if a loan is in default; (2) no more than every 6 months; and (3) when there is an actual report of the BPO assessment, Ocwen didn't follow this policy with the Plaintiff's account.  BPO assessments were made within three months apart and multiple assessments were duplicative and for services that Ocwen has been unable to substantiate.  Ms. Johnson attempted to explain that many of these BPO assessments were an offset against other BPO fees, but once again Ocwen's records contradict her testimony.

Ocwen also charged the Plaintiff for various litigation and bankruptcy fees, not only for Mr. Mulligan's bankruptcy filing in 1997, but also for attempts at foreclosure in 2004 and 2009.

Not only were these fees unauthorized, Ocwen was unable to substantiate them and some of the charges were obviously duplicative as a result of more mistakes made by Ocwen.  Ms. Johnson attempted to explain these errors by testifying that many were not actually charged to the Plaintiff.  The Court is not convinced.

Ms. Saunders testified, and the Court agrees, that Ocwen commenced a convoluted and inconsistent series of servicing demands on the Plaintiff that resulted in the assessment of $12,618.14 in impermissible fees and charges (including the unauthorized interest arrearage balance) to the Plaintiff's account between 1997 and 2009.  Also during this time period, the Plaintiff misapplied $2,666.95 of these payments toward the fees and charges in direct contravention of the Note and Mortgage.

**D.     Ocwen's Excuse – The 2004 and 2005 Forbearance Agreements**

Ocwen admits that the Note and Mortgage do not allow the assessment of many of its charges, but denies that the charges it assessed were improper.  Ocwen takes the position that it was allowed to collect for these fees and expenses pursuant to the terms of two forbearance agreements entered into on November 9, 2004 (the "2004 Forbearance Agreement") and December 5, 2005 (the "2005 Forbearance Agreement").  Specifically, Ocwen refers to a provision in the 2004 Forbearance Agreement allowing Ocwen to charge and add to the Plaintiff's Loan balance many of the costs that it assessed:

> **3B Fees and Costs**
>
> b. You specifically understand that Ocwen has the right to charge, and add to your loan balance, the costs of the following items: appraisals and broker price opinions, inspections, any advances which are made to pay taxes and/or insurance, foreclosure attorneys' fees and expenses, and collection fees.

Moreover, Ocwen also refers to a release in the 2004 Forbearance Agreement for "any and all claims, to the extent that any claims may exist now, that are related or connected in any manner, directly or indirectly, to the Note, Mortgage, or aforementioned parties."  The 2005

21

Forbearance Agreement includes a similar waiver provision as well as a provision requiring the Plaintiff to pay any reasonable and necessary attorneys' fees and costs incurred by Ocwen.

Ocwen's reliance is misplaced because the 2004 and 2005 Forbearance Agreements are meaningless where the evidence shows that the Plaintiff had already paid off her Loan prior to entering into the agreements. On August 4, 2003, Ocwen provided at the Plaintiff's request a payoff statement showing the following breakdown of the amounts still due on the Loan:

| | |
|---|---|
| Unpaid principal balance: | $10,435.88 |
| Interest: | $194.24 |
| Interest arrearage: | $963.13 |
| Late charges: | $360.05 |
| Property Valuation Fee: | $90.00 |
| Bankruptcy fees: | $500.00 |
| Bankruptcy costs: | $92.00 |
| Certified Mail Cost: | $8.58 |
| TOTAL: | $12,643.88 |

At the time the Plaintiff was current on her monthly payments, but Ocwen represented to her that she had a delinquency of $2,013.76. This delinquency includes: (1) interest arrearage of $963.13; (2) late charges of $360.05; (3) property valuation fee of $90.00; (4) bankruptcy fees of $500.00; (5) bankruptcy costs of $92.00; and (6) a certified mail cost of $8.58.

To cure the delinquency, the Plaintiff entered into her first written forbearance plan with Ocwen on August 5, 2003 (the "2003 Forbearance Agreement"). The Plaintiff agreed that to remedy the delinquency in her Loan of $2,013.76, the Plaintiff would, beginning August 1, 2003, and continuing through November 1, 2003, make a modified monthly payment of $333.93.

On August 19, 2003, the Plaintiff paid $2,231.33 to complete her 2003 Forbearance Plan. In addition to the August 1 and September 1, 2003 payments, the payment was also applied to pay off securitized interest and the fees, costs, and charges identified as part of the deficiency amount. Ocwen then declared the Plaintiff's Loan current.

22

Ocwen applied the Plaintiff's payment of $2,231.33 to charges that Ocwen was not authorized to make, namely the BPO fees, bankruptcy fees, late charges in excess of $8.53, and the securitized interest.  Ms. Saunders testified that if Ocwen had not been misapplying the Plaintiff's payments to charges such as these, even assuming the highest unpaid principal balance at the time the Loan boarded, the Plaintiff would only have been in arrears $185.33, not $2,013.00.

The Plaintiff made her October 1, 2003 payment, but according to Ocwen's records, failed to make her payments for November 1, 2003, or July 1, August 1, or September 1, 2004. In October 2004, the Defendants filed a foreclosure suit against the Plaintiff in Campbell Circuit Court based on the Plaintiff's alleged delinquency on the account.  On October 24, 2004, the Plaintiff made a payment of $900.00.  The Plaintiff then entered into a second forbearance agreement, the 2004 Forbearance Agreement, to stop the foreclosure.  The 2004 Forbearance Agreement cited a reinstatement amount of $1,782.78 and a current contractual due date of September 1, 2004.  The Plaintiff agreed to pay $900.00 by November 8, 2004 and $300.00 per month until October 1, 2005.

However, at time that the Plaintiff signed the 2004 Forbearance Agreement to stop the foreclosure, the Defendants had no right to foreclose on her home because she had paid off her Loan in full on October 29, 2004.  In fact, pursuant to Ms. Saunders' testimony, the Court finds that the Plaintiff had overpaid her obligation to the Defendants as of October 29, 2004, by $747.49.

**E.      Ocwen Overcharges the Plaintiff**

Despite paying her obligation in full by October 29, 2004, Ocwen continued to collect payments from the Plaintiff.  Ms. Saunders testified, and the Court finds, that the Plaintiff had overpaid her obligation to the Defendants by $494.19 when she entered into the 2005 Forbearance Agreement .  Ms. Saunders further testified, and the Court finds, that the Plaintiff

23

had overpaid her obligation by $3,839.05 when the Defendants instituted foreclosure

proceedings for a third time on June 19, 2009 in Campbell Circuit Court.

**F.      The Chapter 13 Bankruptcy and Adversary Proceeding**

The Plaintiff filed for Chapter 13 bankruptcy on July 15, 2009 to stop the Defendants'

foreclosure on her home.  The Defendants subsequently filed a proof of claim for a secured debt

demanding $836.24 in outstanding principal, as well as $19.11 in interest, and $4,697.83 in

outstanding fees and costs.  The Plaintiff objected to the proof of claim and then filed the

present adversary proceeding, asserting various counterclaims against the Defendants.

The Plaintiff brought the underlying adversary proceeding on December 7, 2009,

objecting to the Defendants' secured claim and asserting counterclaims for offset or

recoupment.  The Plaintiff's counterclaims include the following:

> (1)  violations of K.R.S. §360.010 and §360.020 (Count I);
>
> (2)  violations of Kentucky's Consumer Protection Act, or K.R.S. §367.110 (Count II);
>
> (3)  fraud/intentional misrepresentation (Count III);
>
> (4)  conversion (Count IV);
>
> (5)  breach of implied covenant of good faith (Count V);
>
> (6)   negligent misrepresentation (Count VI);
>
> (7)  breach of contract (Count VII);
>
> (8)   "equity abhors a forfeiture" (Count VIII); and
>
> (9)   violations of the Fair Debt Collection Practices Act, or 15 U.S.C. §1692 *et seq.* ("FDCPA") (Count IX).

On June 17, 2010, the Defendants moved for partial summary judgment on several of

the Plaintiff's counts.  The Plaintiff moved for summary judgment on all her claims as well.  The

Court granted partial summary judgment for the Defendants on the Plaintiff's Count II, violations

of the Kentucky Consumer Protection Act.  However, the Court denied the parties' motions for

partial summary judgment on the remaining counts because there remained genuine issues of

material fact regarding Plaintiff's Loan balance at various points in Ocwen's servicing tenure.

A trial was conducted on the remaining counts on April 19, 2012.  The Court ordered the

parties to file proposed findings of fact and conclusions of law and the matter was submitted on

May 11, 2012.

### Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §1334.  This is a core proceeding

pursuant to 28 U.S.C. §157(b)(2)(B) and (C).  Because the parties have consented, the Court

may enter final judgment on all Counts.  *See Stern v. Marshall,* 31 S.Ct. 2594 (2011); *In re*

*Safety Harbor Resort & Spa*, 456 B.R. 703, 718 (Bankr. M.D. Fla. 2011).  Venue is proper

pursuant to 28 U.S.C. §1409.

### Analysis

**A.    The Objection to Claim**

Although the Court's factual findings and review of the Plaintiff's various counterclaims

make this case appear complicated, this case is, in reality, very simple.  The Plaintiff's objection

to the Defendants' proof of claim and her counterclaims rise and fall on an accounting of the

Plaintiff's Loan.  Since the inception of this litigation, the parties have focused on the Plaintiff's

various counterclaims.  The Plaintiff has vigorously pursued her breach of contract and fraud

claims, as well her allegations that the Defendants violated consumer protection law, and the

Defendants have also vigorously defended against these causes of action at every stage of this

litigation.  This notwithstanding, the primary issue before this Court is whether the Defendants'

claim should be allowed pursuant to 11 U.S.C. §502.

The Defendants have submitted Proof of Claim #14-1 for an unpaid principal balance of

$836.24, unpaid interest of $19.11, and outstanding fees and costs of $4,697.83.  Attached to

the proof of claim are the Plaintiff's Note and Mortgage, the Assignments, and a summary of the

charges entitled "Payoff Information."  Pursuant to 11 U.S.C. §502(a),

> A claim or interest, proof of which is filed under section 501 of this title, is
> deemed allowed, unless a party in interest, including a creditor of a general
> partnership that is a debtor in a case under chapter 7 of this title, objects.

The Defendants' proof of claim has been properly filed pursuant to Fed. R. Bankr. P. 3001.[9]

The Defendants' proof of claim is therefore *prima facie* evidence of the validity and amount of

the claim.  Fed. R. Bankr. P. 3001(f).

The Plaintiff, as the party objecting to the properly filed proof of claim, has the initial

burden of going forward and presenting sufficient probative evidence to overcome the *prima*

*facie* or presumptive effect of this filing.  *In re Aton Components, Inc.*, 99 F.3d 1138 (6th Cir.

1996) (table); *see also In re Harrison*, 987 F.2d 677 (10th Cir. 1993); *In re Allegheny Int'l, Inc.*

954 F.2d 167 (3d Cir. 1992).  The Plaintiff must produce evidence "equal in force to the prima

facie case" to meet her burden by a preponderance of the evidence.  *See In re Kemmer*, 316

B.R. 706, 713 (Bankr. E.D. Tenn. 2004) (citing *In re Allegheny Int'l, Inc.*, 954 F.2d at 173-174).

Here, the Defendants' proof of claim relies exclusively on the attached Note and

Mortgage.  By its very terms, the Note and Mortgage do not allow for the recovery by the lender

or holder of any costs or fees associated with default and foreclosure; yet the Defendants' proof

---

[9] Proofs of claim are governed primarily by Federal Rule of Bankruptcy Procedure 3001, which provides, in material part:

(*a*) *Form and content.*  A proof of claim is a written statement setting forth a creditor's claim. A proof of claim shall conform substantially to the appropriate Official Form.

*(b) Who may execute.*  A proof of claim shall be executed by the creditor or the creditor's authorized agent except as provided in Rules 3004 and 3005.

*(c) Claim based on a writing.*  When a claim, or an interest in property of the debtor securing the claim, is based on a writing, the original or a duplicate shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim. ....

*(f) Evidentiary effect.*  A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.

of claim seeks "fees, costs and property preservation expenses," which is the bulk of the Defendants' claim. The Plaintiff has easily met her burden in bringing sufficient probative evidence questioning the validity of the Defendants' claim.

The ultimate burden therefore remains on the Defendants to prove the validity of the claim by a preponderance of the evidence. *In re Kemmer*, 315 B.R. at 713. The Defendants have failed to meet their burden. The evidence to support the Defendants' claim depends on Ocwen's records and Ms. Johnson's testimony, neither of which are reliable. Ocwen's records, to the extent that they exist, are a mess. They are internally inconsistent and often bewildering. Ms. Johnson, one of Ocwen's top senior loan analysts, cannot make sense of Ocwen's records. She has been unable to adequately explain their inconsistencies. Ms. Johnson has admitted to several mistakes by Ocwen in servicing the Loan, yet asks this Court to accept her testimony and Ocwen's documents as reliable in spite of these "mistakes." The Court cannot do so.

This litigation has been ongoing since December 2009. In over three (3) years, the Defendants have been unable to explain their records or substantiate the charges to the Plaintiff's account that ultimately form the basis of the Defendants' claim. "A lender has an obligation to keep a full and accurate accounting of payments made and charges accrued, should be prepared to explain the contractual basis for all charges, and should be able to document that charges such as inspection fees, court costs, and the like were actually incurred or paid." *In re Parrish*, 326 B.R. 708, 721 (Bankr. N.D. Ohio 2005); *In re Jacobson*, 5 B.R. 274, 277 (Bankr. S.D. 1980). The Defendants have failed to meet this mark.

Based on the Court's findings, the Plaintiff has fully paid her obligation to the Defendants and did so years prior to this bankruptcy. Therefore the Defendants Proof of Claim #14-1 shall be disallowed in its entirety.

**B.     The Counterclaims**[10]

    **(1)     Breach of Contract (Count VII), Breach of Implied Covenant of Good Faith
(Count V),  Fraud (Count III), and Negligent Misrepresentation (Count VI)**

    In conjunction with the Plaintiff's objection to the Defendants' proof of claim, the Plaintiff has also brought various counterclaims.  Of these counterclaims, the Court may dispose of the Plaintiff's breach of contract (Count VII), breach of implied covenant of good faith (Count V), fraud/intentional misrepresentation (Count III),  and negligent misrepresentation (Count VI) claims together.

    The Mortgage and the Note require payments to be applied to escrow, principal and interest and do not allow the Defendants to direct the monthly payments to any other category of charges.  According to the Plaintiff, the Defendants' assessment of fees and expenses not authorized by the Note and Mortgage, and application of an interest arrearage balance that is not substantiated by Ocwen, is a breach of contract.

    The Defendants do not dispute the terms of the Mortgage and Note, or that they assessed an interest arrearage balance and many charges in contravention of the Note and Mortgage.  Rather, the Defendants primarily argue that they were allowed to assess and collect on the fees and charges by the terms of the 2004 and 2005 Forbearance Agreements and that in signing the 2005 Forbearance Agreement, the Plaintiff waived any such prior claims against them.

    But the 2004 and 2005 Forbearance Agreements lack consideration and are unenforceable.  A forbearance agreement is unenforceable if it is induced by fraud or bad faith:

        [F]orbearance to sue on a claim clearly groundless is not support by a
        sufficient consideration for the reason that the promotion of such a suit

---

[10] As previously indicated in the Court's Memorandum Opinion granting in part and denying in part the parties' cross-motions for summary judgment, the Court views the Plaintiff's Count VIII of the Complaint, or "equity abhors forfeiture", as a request for equitable relief.  Generally, the maxim "equity abhors a forfeiture" is used in the context of residential mortgage litigation and is asserted as a defense to a foreclosure.  *See, e.g., Sovereign Bank, FSB v. Kielzow*, 687 A.2d 1039, 1044 (N.J. Supr. Ct. App. Div. 1997).  The Defendants' foreclosure action is not before this Court.

> would be held fraudulent or wanting in good faith; but, short of that,
> forbearance to sue is a good consideration for a promise founded thereon.
> It is only essential that the claim be asserted in good faith.

See Cook v. Cook, 299 S.W.2d 261, 264 (Ky. 1957); see also Ruckel v. Baston, 252 S.W.2d

432 (Ky. 1952) (holding forbearance to prosecute a doubtful claim asserted in good faith will

constitute adequate consideration).  At the time the Plaintiff entered into the 2004 Forbearance

Agreement, she had paid the Loan in full.  As such, Ocwen had no right to threaten foreclosure

on her property and did not act in good faith in doing so.

Fraud is established by clear and convincing evidence that there was (1) a material

misrepresentation; (2) which is false; (3) known to be false or made recklessly; (4) made with

inducement to be acted upon; (5) acted in reliance thereon; and (6) injury.  See United Parcel

Serv. Co. v. Rickert, 996 S.W.2d 464, 468 (Ky. 1999).  The Plaintiff has met her burden.

Ocwen's repeated representations to the Plaintiff that she was in default were materially false

representations that Ocwen knew or should have known to be untrue.  Ocwen had the key

documents, the Note and Mortgage, in its possession.  It knew or should have known that the

Note and Mortgage did not allow these charges yet it assessed them anyway for over a period

of ten (10) years.

Moreover, the Plaintiff questioned the charges many times over the course of Ocwen's

servicing and Ocwen did nothing to investigate her concerns.  In fact, Ocwen took no steps to

research and fully reconcile the Plaintiff's account until the eve of trial.  The Court finds this

unacceptable behavior on Ocwen's part, as it is clear that an investigation into the account

would have likely resulted in revealing Ocwen's "mistakes" much earlier and perhaps prevented

this litigation all together.  But Ocwen chose to ignore the Plaintiff and was clearly unwilling to

do such a task until forced to do so in response to the Plaintiff's objections to the Defendants'

claim.

The Plaintiff reasonably relied on Ocwen's representations that she was in default on her Loan before entering into the 2004 and 2005 Forbearance Agreements. The Plaintiff had no reasonable choice when faced with the loss of her home but to rely on Ocwen's false representations as to the status of her Loan. The Plaintiff was therefore fraudulently induced to enter into the 2004 and 2005 Forbearance Agreements. As such, these Agreements lack consideration and are unenforceable.

Ocwen does not dispute that it charged the Plaintiff's account for impermissible fees and costs contrary to the Note and Mortgage, a fact that the evidence supports. The Defendants therefore breached their contract with the Plaintiff. The Plaintiff has been damaged by overpaying her Loan as a result of these impermissible fees and charges, and allocation of her payments to an unsubstantiated interest arrearage balance, in the amount of $3,839.05.

Furthermore, in Kentucky, every contract has an implied covenant of good faith and fair dealing. *Forsythe v. BancBoston Mortg. Corp.*, 135 F.3d 1069 (6th Cir. 1997). The Note and Mortgage do not explicitly state that the Defendants are required to accurately apply the Plaintiff's payments. But "[w]hen a contract is silent with respect to a matter vital to the rights of the parties, a court, in construing it, is necessarily compelled to resort to a consideration of the surrounding circumstances and the conduct of the participants indicating their interpretations." *Ranier v. Mount Sterling Nat. Bank*, 812 S.W.2d 154, 156 (Ky. 1991) (citing *Caudill v. City of Maysville*,178  S.W.2d 945, 946 (1944)). Implicit in the parties' contract is the duty of the lender to keep an accurate accounting of the Plaintiff's Loan. Ocwen failed to do so. While the Plaintiff may not recover in tort for its actions, see *Crestwood Farm Bloodstock, LLC v. Everest Stables*, No. 5:09-CV-317-KKC and 5:10-CV-00072-KKC, 2012 WL 1088237, *3 (E.D. Ky. March 30, 2012), the Plaintiff has proven that the Defendants violated their implied duty of good faith and fair dealing based on her contract with the Defendants.

Thus, judgment shall be entered for the Plaintiff in the amount of $3,389.05, plus

prejudgment interest[11] at the Note rate of 10.875% per annum from October 29, 2004, or the

date that the Plaintiff paid her Loan in full, until the date hereof, as to Counts III (fraud/intentional

misrepresentation); V (breach of implied covenant of good faith); and VII (breach of contract) of

the Complaint.  Furthermore, because the Court finds in the Plaintiff's favor on her fraud count,

and holds that Ocwen was grossly reckless in the accounting and servicing of the Plaintiff's

Loan, it is unnecessary for the Court to rule on the Plaintiff's claim for negligent

misrepresentation (Count VI).

### (2)    Conversion (Count IV)

Not only did the Defendants' breach their contract and implied covenant of good faith

with the Plaintiff and fraudulently induce the Plaintiff to enter into the 2004 and 2005

Forbearance Agreements, but in doing so, the Defendants have intentionally converted the

Plaintiff's money in the amounts that it overcharged her.

The elements of conversion require proof that (1) the Plaintiff had legal title to the

converted property; (2) the Plaintiff had possession of the property or the right to possess it at

the time of conversion; (3) the Defendants exercised dominion over the property in a manner

which denied the Plaintiff's rights to use and enjoy the property and which was to the

Defendants' own use and beneficial enjoyment; (4) the Defendants intended to interfere with the

Plaintiff's possession; (5) the Plaintiff made some demand for the property's return which the

Defendants refused; (6) the Defendants' act was the legal cause of the Plaintiff's loss of the

property; and (7) the Plaintiff suffered damage by the loss of the property.  *See Kentucky Assn.*

*of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n. 12 (Ky. 2005) (citing 90

---

[11] Prejudgment interest is a matter of state law where recovery depends on state law causes of action.
*See Payne v. Brace (In re Brace),* 131 B.R. 612, 614 (Bankr. W.D. Mich. 1991).  In Kentucky, when
damages are "liquidated" then prejudgment interest follows as a matter of course but when damages are
unliquidated, then the issue is a matter within the discretion of the trial court or jury.  *Nucor Corp. v.
General Electric Co.*, 812 S.W.2d 136, 141 (Ky. 1991).

C.J.S. Trover and Conversion §4 (2004)).  The traditional measure of damages for

conversion is the fair market value of the property at the time of the conversion, with interest, at

the discretion of the fact finder, from the time of conversion.  *Batson v. Clark*, 980 S.W.2d 566,

574 (Ky. App. 1998).

The evidence shows that the Defendants overcharged the Plaintiff in the amount of

$3,839.05 as of June 19, 2009, the date of Ocwen's last foreclosure attempt prior to bankruptcy.

Thus, the Court shall enter judgment in favor of the Plaintiff on Count IV of the Complaint in the

amount of $3,839.05, plus prejudgment interest as set forth above.

### (3)    K.R.S. §360.010 and §360.020 (Count I)

The Plaintiff alleges that the Defendants violated K.R.S. §360.010 by charging the

Plaintiff interest on an artificially high principal balance as a result of assessing improper fees

and costs.  K.R.S. §360.010 states,

> (1)   The legal rate of interest is eight percent (8%) per annum, but any
> party or parties may agree, in writing, for the payment of interest in excess
> of that rate as follows: (a) at a per annum rate not to exceed four percent
> (4%) in excess of the discount rate on ninety (90) day commercial paper in
> effect at the Federal Reserve Bank in the Federal Reserve District where
> the transaction is consummated or nineteen percent (19%), whichever is
> less, on money due or to become due upon any contract or other obligation
> in writing where the original principal amount is fifteen thousand dollars
> ($15,000) or less, and (b) at any rate on money due or to become due
> upon any contract or other obligation in writing where the original principal
> amount is in excess of fifteen thousand dollars ($15,000); and any such
> party or parties, and any party or parties who may assume or guarantee
> any such contract or obligation, shall be bound for such rate of interest as
> is expressed in any such contract, obligation, assumption, or guaranty, and
> no law of this state prescribing or limiting interest rates shall apply to any
> such agreement or to any charges which pertain thereto or in connection
> therewith; provided, however, nothing herein contained shall be construed
> to amend, repeal, or abrogate any other law of this state pertaining to any
> particular types of transactions for which the maximum rate of interest is
> specifically prescribed or provided.
>
> (2)   Any state or national bank may charge ten dollars ($10) for any loan
> negotiated at the bank in this state, even if the legal interest does not
> amount to that sum.

K.R.S. §360.020(1) sets forth the civil penalty for charging an excessive interest rate and

provides:

> The taking, receiving, reserving, or charging of a rate of interest greater
> than is allowed by K.R.S. §360.010, when knowingly done, shall be
> deemed a forfeiture of the entire interest which the note, bill, or other
> evidence of debt carries with it, or which has been agreed to be paid
> thereon.  In case the greater interest rate has been paid, the person by
> whom it has been paid, or his legal representatives, may recover, in an
> action in the nature of an action of debt, twice the amount of interest thus
> paid from the creditors taking or receiving the same: provided, that such
> action is commenced within two (2) years from the time the usurious
> transaction occurred.

Thus, if the Defendants' "knowingly" charged an interest rate "greater than is allowed by K.R.S.

§360.010," then K.R.S. §360.020 requires a forfeiture of the interest and the Plaintiff may

recover twice the amount of such interest paid to the Defendants.

Although the evidence is clear that the Defendants' collected interest that was not owed

under the Note and Mortgage, there is no evidence that the Defendants charged interest at a

*rate* higher than that allowed by K.R.S. §360.010.  The Plaintiffs do not argue that the interest

rate under the Note, or 10.875%, is contrary to Kentucky law.  There is no evidence that the

Defendants charged the Plaintiff for any other interest rate than the interest rate allowed under

the Note; rather Ocwen charged the same interest rate, but on a higher principal balance.

Therefore, the Court shall enter judgment in the Defendants' favor as to the Plaintiff's Count I of

the Complaint.

### (4)    The Fair Debt Collection Practices Act, or 15 U.S.C. §1692 *et seq.* (Count IX)

The Plaintiff also seeks to recover for Ocwen's violations of the Fair Debt Collection

Practices Act (the "FDCPA").  The FDCPA prohibits a "debt collector" from engaging in abusive,

deceptive, and unfair practices.  The Plaintiff argues that Ocwen is a "debt collector" within the

meaning of the statute and has violated the FDCPA by (i) misrepresenting the character,

amount or legal status of the debt in violation of §1692e(2)(A);  (ii) misrepresenting the services

33

rendered or compensation which may be lawfully received in connection with the collection of

the debt in violation of 15 U.S.C. §1692e(2)(B);  (iii) threatening to take action that cannot be

legally taken in violation of §1692e(5);  (iv)  generally utilizing false and deceptive means to

collect or attempt to collect a debt in violation of §1692e(10); (v) engaging in conduct the natural

consequence of which is to harass, oppress, or abuse any person in connection with the

collection of a debt in violation of §1692d; and (vi) attempting to collect an amount in excess of

what is lawfully owed in violation of §1692f(1).

The parties do not dispute that the Plaintiff is a "consumer" within the definition of the

FDCPA.  Rather, the parties disagree as to whether the FDCPA applies to Ocwen as a "debt

collector."  A "debt collector" is defined as:

> [a]ny person who uses an instrumentality of interstate commerce or the
> mails in any business the principal purpose of which is the collection of any
> debts, or who regularly collects or attempts to collect, directly or indirectly,
> debts owed or due or asserted to be owed or due another.
> Notwithstanding the exclusion provided by clause (F) of the last sentence
> of this paragraph, the terms includes any creditor who, in the process of
> collecting his own debts, uses any name other than his own which would
> indicate that a third person is collecting or attempting to collect such
> debts…The term does not include –
>
> (F)  any person collecting or attempting to collect any debt owed or due or
> asserted to be owed or due another to the extent such activity (i) is
> incidental to a bona fide fiduciary obligation or a bona fide escrow
> arrangement;…[or] (iii) concerns a debt which was not in default at the time
> it was obtained by such person…

15 U.S.C. §1692a(6).

In the Sixth Circuit, the FDCPA is applied broadly.  *See Bridge v. Ocwen Fed. Bank,*

*FSB*, No. 07-02739, 2012 WL 1470146, *6 (6th Cir. Apr. 30, 2012) .  With this principle of

construction in mind, the Sixth Circuit has held that "the debt collector pursuant to

§1692a(6)(F)(iii) includes any non-originating debt holder that either acquired a debt in default

or has treated the debt as if it were in default at the time of acquisition. It matters not whether

such treatment was due to a clerical mistake, other error, or intention."  *Id.*; *see also Perry v.*

*Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985).  The Plaintiff has the burden of proving

that Ocwen is a "debt collector."  *Golliday v. Chase Home Finance, LLC*, 761 F. Supp. 2d 629,

635 (W.D. Mich. 2011) (citing *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll and Bertolotti*,

374 F.3d 56, 60-61 (2nd Cir. 2004) ("[T]he plaintiff in a FDCPA action bears the burden of

proving the defendant's debt collector status")).

    The parties are in agreement that the Loan was not "contractually current" (to use

Ocwen's terminology) either when Ocwen became the owner of the loan on January 1, 1997, or

when it began servicing the Loan for BOA on November 1, 1997.  Ocwen contends, however,

that Tolliver was performing pursuant to a forbearance agreement or payment plan on both

dates.  If Tolliver was performing on her forbearance plan at the time Ocwen purchased the

Loan, Ocwen is not a debt collector covered under the FDCPA.  *Bailey v. Security Nat'l

Servicing Corp.*, 154 F.3d 384, 387-88 (7th Cir. 1998) ("The plain language of §1692a(6)(F) tells

us that an individual is not a 'debt collector' subject to the Act if the debt he seeks to collect was

not in default at the time he purchased (or otherwise obtained) it.")

    As found above, the weight of the evidence shows that the Plaintiff was timely making

payments pursuant to a forbearance payment plan agreement on the date Ocwen purchased

the Loan.  The Plaintiff was making and HUD was accepting payments of $275.00 per month

pursuant to this agreement with HUD prior to the Loan boarding with Ocwen and at the time

Ocwen acquired the Loan.  Thus, Ocwen is not a "debt collector" pursuant to §1692(a)(6) and

the Court shall enter judgment in the Defendants' favor on Count IX of the Complaint.

    **(5)**    **Kentucky's Consumer Protection Act ("KCPA"), or K.R.S.
§367.110 (Count II)**

    Count II of the Plaintiff's Complaint asserts a claim for violations of the KCPA.  The Court

has already determined that the KCPA does not apply to actions involving real estate mortgages

and that Count II of the Complaint should be dismissed in granting the Defendants' partial

summary judgment.  At the time, the Court made a recommendation to the District Court for

entry of a final judgment on this Count pursuant to the dictates of *Stern v. Marshall*, *supra*.  The

parties have now consented to entry of final judgment on all Counts, thus the Court shall enter a

final judgment dismissing Count II of the Plaintiff's Complaint.

## C.    Punitive Damages

The Plaintiff is entitled to an award of punitive damages for Ocwen's grossly reckless

and fraudulent conduct.  According to the Kentucky Supreme Court,

> Kentucky's punitive damage statutes, K.R.S. §411.184[12] and K.R.S.
> §411.186, were enacted "to further [Kentucky's] legitimate interests in
> punishing unlawful conduct and deterring its repetition." *BMW of North
> America, Inc. v. Gore*, 517 U.S. 559, 568, 116 S.Ct. 1589, 1595, 134
> L.Ed.2d 809 (1996).  Those statutes "determin[e] the level of punitive
> damages that [Kentucky] will allow in different classes of cases and in any
> particular case [and they require] that the damages awarded be reasonably
> necessary to vindicate the State's legitimate interests in punishment and
> deterrence." *Id.*

*Ragland v. Digiuro*, 352 S.W.3d 908, 916 (Ky. App. 2010).  K.R.S. §411.184(2) states that a

plaintiff "shall recover punitive damages only upon proving, by clear and convincing evidence,

that the defendant from whom such damages are sought acted toward the plaintiff with

oppression, fraud or malice."  "Fraud" is defined as "intentional misrepresentation, deceit or

concealment of material fact known to the defendant and made with the intention of causing

injury to the plaintiff."  K.R.S. §411.184(1)(b).

Moreover, the threshold for an award of punitive damages in Kentucky is whether the

misconduct was "outrageous" in character.  *See Peoples Bank of Northern Kentucky, Inc. v.

Crowe Chizek and Company, LLC*, 277 S.W.3d 255, (Ky. App. 2008) (citing *Horton v. Union

Light, Heat & Power Co.*, 690 S.W.2d 382, 389 (Ky. 1985)).  Ocwen's conduct rises to this level.

*Id.*

---

[12] Only section (1)(c) of K.R.S. §411.184, defining "malice" has been declared unconstitutional. *Williams v. Wilson*, 972 S.W.2d 260, 269 (Ky. 1998) (K.R.S. §411.184(1)(c) is a violation of jural rights to the extent it changes the common law standard for awarding punitive damages).

The Plaintiff has met her burden and is entitled to punitive damages because Ocwen recklessly disregarded the terms of the Plaintiff's Loan documents and proceeded to collect from her unauthorized charges while at the same time misapplying the Plaintiff's payments and failing to keep an accurate accounting of the Plaintiff's Loan.  Ocwen then fraudulently induced the Plaintiff to enter into forbearance agreements with terms that allowed it to assess the charges that it wasn't allowed to otherwise charge.  These forbearance agreements were used as a vehicle for Ocwen to make more money from servicing the Plaintiff's Loan, to the Plaintiff's detriment.  The Plaintiff challenged Ocwen's accounting and Ocwen did nothing to address her concerns or to verify that its accounting was accurate.  Rather, it bullied the Plaintiff to enter into meaningless forbearance agreements, which she "completed," while at the same time constantly dunning her after she attempted to "cure" her "defaults."   Ocwen ignored the Plaintiff's pleas until she finally filed bankruptcy and this adversary proceeding and even then failed to do a full forensic accounting on her Loan until the eve of trial.  Based on the foregoing, the Court shall award the Plaintiff punitive damages in the amount of $25,000.00.

**D.     Spoliation**

Finally, the Plaintiff argues she is entitled to an evidentiary sanction that permits the Court to draw an adverse inference in her favor for the Defendants' destruction of the prior Loan servicing documents for the Plaintiff's Loan.  *See Beaven v. U.S. Dept. of Justice*, 622 F.3d 540, 553 (6th Cir. 2010); *Global Technovations, Inc. v. Onkyo U.S.A. Corp. (In re Global Technovations)*, 431 B.R. 739, 778 (Bankr. E.D. Mich. 2010).  The Plaintiff has failed to prove that the Defendants lost or destroyed any evidence in bad faith and the Court declines to sanction the Defendants for their failure to produce these documents, the lack of which is as equally detrimental to the Defendants as the Plaintiff.

**<u>Conclusion</u>**

The foregoing constitutes the Court's findings of fact and conclusions of law.  In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits, and arguments of counsel, regardless of whether or not they are specifically referred to in this decision.  A separate order shall be entered accordingly.

Copies to:

J. Eileen Zell, Esq.

James P. McHugh, Esq.

Michael J. O'Hara, Esq.

Christopher Hill, Esq.

Kelly S. Herzik, Esq.

38

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
*The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.*



**Signed By:**
**<u>*Tracey N. Wise*</u>**
**Bankruptcy Judge**
**Dated: Thursday, July 19, 2012**
**(tnw)**